Jasen, J.
By its enactment of section 153-c of the Public Authorities Law, the Legislature rescinded an increase in the toll charged motorists by the Jones Beach State Parkway Authority for the use of the Southern State Parkway. The statute also provides that the increase cannot be restored nor any future increase imposed unless the authority complies with a new four-stage review process. The issue on this appeal is whether the statute violates either the due process clause of the State Constitution or the contract clause of the Federal Constitution. We hold that it violates both. A further question is whether the Legislature has improperly interfered with the State Comptroller’s discretionary power to supervise the financial accounts of public authorities. We hold that it has.
The Jones Beach State Parkway Authority was created in 1933 for the purpose of financing and constructing the Jones Beach State Parkway and other approaches to Jones Beach State Park. The necessary capital was obtained by the authority through the sale of revenue bonds to the Federal Reconstruction Finance Corporation. The authority is a public benefit corporation (see General Construction Law, § 66, subd 4) with a membership identical to that of the Long Island State Park Commission which has jurisdiction over Jones Beach State Park. (Public Authorities Law, § 152; Temporary State Commission on Coordination of State Activities, Staff Report on Public Authorities under New York State, Legis Doc [1956], No. 46, p 23.) By 1953, the extraordinary post-war increase in the population of Long Island created a need to improve existing streets and highways; roads designed in an earlier age to serve rural, not suburban, -communities. The Legislature determined that, as part of a massive road improvement program, it was necessary to reconstruct, widen, and improve the Southern State Parkway. In order to avoid "pledging the credit of the state and its municipalities”, the Legislature entrusted the task to the Jones Beach State Parkway Authority. (L 1953, ch 114, §§ 1, 2.) The authority was given the explicit power to "reconstruct, widen and otherwise improve and thereafter maintain, reconstruct and operate (a) Southern state parkway, together with incidental parkway facilities now *717 existing or hereafter constructed, on and along said parkway” (Public Authorities Law, § 153-b, subd 2).
The reconstruction of the Southern State Parkway was a project distinct from the authority’s original purpose and was financed separately. (Staff Report, p 23.) The authority issued bonds that were sold to the general investing public. In conjunction with the projected bond issue, the State adhered to its pledge, first made in 1939, not to limit or alter the rights vested in the authority to the detriment of holders of authority bonds issued after January 1, 1939. (Public Authorities Law, § 158-a.) The Parkway reconstruction program was designed as a "self-liquidating” improvement; the cost of the project was to be borne by those who would benefit by it. To that end, the authority was empowered "[t]o charge tolls for the use of the part of the Southern state parkway improved by the authority subject to and in accordance with any agreements with bondholders made as hereinafter provided. The toll shall be ten cents unless the revenues from such tolls and the income from the facilities authorized by the foregoing provisions of this section are insufficient to meet all obligations of such agreements and to pay the costs of operating and maintaining the parkways and facilities operated and maintained by the authority pursuant to the foregoing provisions of this section. The revenue from such tolls and the income from such facilities shall be used only to meet such obligations and to pay the cost of constructing, reconstructing, operating and maintaining such parkways and facilities” (Public Authorities Law, § 153-b, subd 5.) Toll receipts were pledged to secure the authority’s obligation on its bonds. (See Public Authorities Law, § 153-b, subd 6.)
Absent contrary agreement with the bondholders, the State Comptroller was to serve as the authority’s fiscal agent. The State Comptroller and his authorized representatives were empowered "from time to time to examine the accounts and books of the parkway authority, including its receipts, disbursements, contracts, leases, sinking funds, investments and other matter relating to its financial standing.” (Public Authorities Law, § 156.) The reconstruction was successfully accomplished and toll booths were erected at the westerly terminus of the Parkway at Valley Stream. The improved Parkway became a major artery for the flow of traffic, principally commuter in nature, between New York City and eastern Long Island. As the years passed, the authority collected *718 the 10 cent toll and applied the proceeds to the cost of its operations and to the repayment of its bonds. Of the $40,000,-000 in bonds issued in 1954, only approximately $8,300,000 remain outstanding.
In 1974, the advisability of an increase in the toll was raised for the first time. A nationwide scarcity of petroleum resulted in a reduction in use of private gasoline-powered vehicles and, hence, to a diminution in the authority’s main source of revenue. The authority commissioned a study on the projected traffic-generated revenue and projected levels of expense. At the same time, the authority undertook consideration of the need to improve the highway. The study reported that it would cost approximately $17,000,000 to maintain the highway in accordance with present safety standards. The projected "major” improvements, to be completed over a five-year span, included the installation of stress relief joints, pavement resurfacing, bridge repairs, as well as the construction and replacement of guardrails and median barriers. On the other hand, a long-range "capital” improvement program was also planned which would entail the ultimate expenditure of approximately $76,000,000 to be accomplished gradually as funding became available. Capital construction envisaged by this program consisted of the rebuilding of six interchanges, the widening of the Parkway, a roadway lighting program and the installation of a path for bicycles. The study concluded that the existing toll was insufficient to meet the authority’s present expenses and debt service obligations. Further, only a 25 cent toll would enable the authority to cover its expenses, implement the major improvement program fully, and raise approximately 40% of the cost of capital reconstruction.
On December 13, 1974, the authority announced that the toll would be increased to 25 cents, effective January 1, 1975. The increase in toll led to a rise in traffic levels on the local streets in the vicinity of the toll plaza as motorists made detours in attempt to avoid paying the increased toll. The increase was politically sensitive. The controversy was heightened when the State Comptroller, on February 21, 1975, issued a report to the effect that only a 5 cent increase in the toll, when coupled with certain accounting adjustments, would provide enough revenue for current expenses and for the major improvement program. Three weeks later, the Governor signed into law chapter 17 of the Laws of 1975 which rescinded the increase in the toll.
*719 The statute provides that at least 120 days prior to the effective date of any proposed toll increase, the authority must submit a detailed written report to the State Comptroller justifying the need for an increase with various fiscal data. (Public Authorities Law, § 153-c, subd 2.) The Comptroller "shall review any proposed increase or imposition in tolls and the report required by subdivision two of this section and within sixty days make public his findings, conclusions and recommendations.” (Subd 3.) In preparing his views, the Comptroller may enlist the assistance of the Commissioner of Transportation. The authority must hold a public hearing upon the proposed increase at least 15 days prior to its effective date. Notice of the hearing must be published and the reports of authority and Comptroller made available for public inspection. "Following such public hearing, the authority shall reconsider the proposed increase or imposition and may rescind, change or modify the proposal as it then deems necessary or advisable.” (Subd 4.)
The authority and the institutional trustee for the bondholders commenced an action for a judgment declaring section 153-c of the Public Authorities Law unconstitutional. Special Term held, on plaintiffs’ motion for summary judgment, that the provision rescinding the toll increase (subd 1) was an impairment of contract in violation of the Federal Constitution and enjoined the defendants from enforcing it.* However, the court also concluded that the other provisions of the statute, relating to future toll increases, did not impair the contract rights of the bondholders and, even assuming a "technical” impairment, should be sustained as a reasonable exercise of the police power. (83 Misc 2d 372.) The Appellate Division, by a divided court, affirmed the judgment of Special Term. (52 AD2d 171.) Two Justices dissented in part, taking the view that, even as to the toll rollback provision, the statute did not impair the rights of the bondholders.
We hold that the statute, in its entirety, is unconstitutional and would modify the order of the Appellate Division accordingly. The statute deprives the bondholders of property with *720 out due process of law in violation of the State Constitution. Further, the statute impairs the obligation of the State’s own contract with the bondholders and, thus, violates the contract clause of the Federal Constitution. Finally, the Legislature has infringed upon the State Comptroller’s discretionary power to supervise the financial accounts of public authorities.
The State Constitution directs that no person shall be deprived of life, liberty or property without due process of law. (NY Const, art I, § 6.) Quite apart from any question presented by the Federal impairment clause, the State may not deprive a party to a contract of an essential contractual attribute without due process of law. "Depriving an owner of property of one of its essential attributes, is depriving him of his property within the constitutional provision” and, absent due process, works an impermissible "forfeiture of the right given by the contract.” (People ex rel. Manhattan Sav. Inst. of City of N.Y. v Otis, 90 NY 48, 52a [Andrews, Ch. J.].)
In this case, the State granted to the authority the power to increase the toll on the Southern State Parkway and pledged not to limit or alter the rights vested in the authority to the detriment of the bondholders. (Public Authorities Law, §§ 153-a, 153-b, subd 5.) Since the toll is the sole source of funds for bond repayment, any limitation on the authority’s power to collect a toll sufficient to pay the bonds deprives the bondholders of an essential attribute of their contract with the authority and with the State and jeopardizes their investment. The statute under consideration suspends a toll increase imposed by the authority and conditions any future increases upon compliance with a complicated and time-consuming procedure. Bondholders were promised, as part of the arrangement which financed the reconstruction of the highway, that the authority could raise the toll if the authority, in its discretion, deemed an increase necessary to pay its operating expenses and meet its bond obligations. With the present statute, the Legislature has diminished the bondholders’ rights by suspending one increase and limiting the authority’s previously broad discretion to impose future increases. Thus, the statute has deprived the bondholders of a right granted by their contract with the authority and the State.
We conclude that the deprivation of the bondholders’ contractual right was achieved without due process of law. Where a statute is challenged on nonprocedural grounds as violative of due process, the test is whether there is "some fair, just and *721 reasonable connection” between the statute and "the promotion of the health, comfort, safety and welfare of society”. (E.g., Montgomery v Daniels, 38 NY2d 41, 54; Nettleton Co. v Diamond, 27 NY2d 182, 193, app dsmd sub nom. Reptile Prods. Assn. v Diamond, 401 US 969; People v Bunis, 9 NY2d 1, 4.) The only asserted justification for the statute was the need to reduce traffic congestion in local streets occasioned by streams of motorists attempting to detour the authority’s toll booths. But, as the Appellate Division noted in another connection, the statute does not prohibit increases, it merely provides a procedure which delays the imposition of an increase for 120 days. (52 AD2d, at p 177.) After the procedure has been complied with, the authority may nevertheless put the proposed increase into effect and motorists are free to resume, with impunity, their toll-dodging ways. The statute does not direct that the 120-day interval be utilized to develop programs to prevent or reduce toll dodging (such as closing off exits within the vicinity of the toll plaza or building additional toll stations on exit ramps) nor does it direct that steps be taken to improve or widen local streets in anticipation of heavy traffic. Traffic will be as congested as it was before. Thus, it cannot be said that the means provided by the statute are reasonably related to the goal to be achieved. There is no fair, just or reasonable connection between the statutory procedure for increasing tolls and the goal of curtailing traffic congestion. Viewed in this light, the statute is arbitrary and deprives bondholders of a contractual right without due process of law.
The Federal Constitution bars the States from enacting legislation impairing the obligation of contracts. (US Const, art I, § 10.) In its covenant with the holders of authority bonds, the State pledged to vest the authority with the power to raise tolls, in its sole discretion, if toll revenues become insufficient to meet the obligations of indebtedness and to pay the costs of operating and maintaining the Parkway and related facilities. (Public Authorities Law, § 153-b, subd 5.) The State also pledged not to limit or alter the rights vested in the authority to the detriment of authority bondholders. (Public Authorities Law, § 158-a.) Since toll revenues are the sole source of funds for bond-repayment, the provision granting the authority the power to increase tolls was an important security provision. Bondholders were guaranteed that the authority would have the necessary power to raise tolls in *722 order to pay authority obligations. This, obviously, was no small concession, nor was it superfluous. A statute • which conditions the authority’s power to increase tolls upon compliance with a review procedure involving the intervention of others from outside the authority is a blow to the independence of the authority’s judgment. Intercession by others outside the authority is not what the bondholders contracted for.
The recent decision by the United States Supreme Court in United States Trust Co. v New Jersey (431 US 1) is instructive. The States of New York and New Jersey had agreed that neither State nor the Port Authority of New York and New Jersey would apply Port Authority revenues to the payment of debts, beyond a specified amount, incurred as a result of mass transportation operations. Both States later repealed this covenant. The court invalidated the repeal on the ground that the States had impaired an obligation of contract. "As a security provision, the covenant was not superfluous; it limited the Port Authority’s deficits and thus protected the general reserve fund from depletion * * * Its outright repeal totally eliminated an important security provision and thus impaired the obligation of the States’ contract.” (431 US, at p 19.)
Just as abrogation of a debt limit threatened the rights of Port Authority bondholders, infringement upon the right to set a proper toll invaded the contractual rights of Jones Beach State Parkway Authority bondholders. It is not necessary that the impairment totally destroy the obligation of the contract. The extent of the impairment is, however, a relevant factor in considering the reasonableness of the impairment. (United States Trust Co. v New Jersey, 431 US 1, 21, supra.)
The State argues that its impairment was justified by an appropriate exercise of the police power. It is true, of course, that the contract clause is not an absolute bar to subsequent modification of a State’s own financial obligations. "As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State’s self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial *723 obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.” (United States Trust Co. v New Jersey, 431 US 1, 25-26, supra.) The nonimpairment clause has never been so construed as to prevent "limited and temporary interpositions with respect to the enforcement of contracts if made necessary by a great public calamity”. (Home Bldg. & Loan Assn. v Blaisdell, 290 US 398, 439.)
However, we cannot say that the asserted traffic emergency was a sufficiently important public purpose to warrant interference with contractual rights. Although there undoubtedly was inconvenience, the record does not reveal any indication that the traffic situation had been so aggravated as to cause extreme difficulties of ingress and egress to the affected areas. Nor can it be said that the statute provided reasonable and necessary means to achieve the public purpose. As previously noted, the statute, at most, delays an increase for a period of 120 days and does not specify that the local communities affected take any corrective action at all to alleviate the problem. Similarly, it has not been shown that the only means to cure the traffic situation was to invade the rights of bondholders. Therefore, we conclude that the statute is in violation of the Federal nonimpairment clause. Because the review procedure is as much an impairment of contractual rights as is the toll rollback itself, the entire statute must be invalidated.
Finally, we conclude that the Legislature has impermissibly infringed upon State Comptroller’s exercise of his discretionary power to supervise the financial accounts of public authorities. For purposes of this discussion, we assume, but do not decide, that the State Comptroller’s power to supervise accounts encompasses authority to review such matters as toll increases.
The Constitution provides that the accounts of any public corporation are subject to the supervision of the State Comptroller. (NY Const., art X, § 5.) The State Comptroller’s responsibility with respect to public corporations must be contrasted with the Comptroller’s constitutional jurisdiction over the State and its political subdivisions. The State Comptroller was made an independent auditing official for the affairs of the State. The Legislature was given the power to "define his powers and duties” and to further assign him the supervision *724 of accounts of any political subdivision. However, the Legislature was precluded from assigning the Comptroller any administrative duties, save those incidental to the performance of the Comptroller’s constitutional functions. (NY Const, art V, § 1.) Article X of the Constitution pointedly employs the same language—"supervision of accounts”—found in article V (III Revised Record of the 1938 New York State Constitutional Convention, p 2262.) Yet the Constitution does not grant to the Legislature the power to define the Comptroller’s powers and duties with respect to public corporations. This crucial difference is explained by the intent of the amendment’s draftsman to build constitutional safeguards that the Legislature could not alter. Hence, the Legislature was not given the power to control the Comptroller’s exercise of discretion since, in doing so, the Legislature might, it was feared, interfere unduly with the independence of the Comptroller’s supervision. Nor is it possible to read the article V and the article X provisions together (see 1959 Opns of Atty Gen 55, 56). While the Legislature may regulate the Comptroller’s duties in regard to political subdivisions, public benefit corporations are not political subdivisions of the State. We have stated many times that, in the words of Judge Fuld, "a public authority enjoys an existence separate and apart from the State, even though it exercises a governmental function”. (Matter of Plumbing, Heating, Piping & Air Conditioning Contrs. Assn. v New York State Thruway Auth., 5 NY2d 420, 424; Matter of New York Post Corp. v Moses, 10 NY2d 199, 203.)
Under the plain language of article X, the State Comptroller is granted the discretionary authority to supervise the accounts of public corporations. In exercising his discretion, the Comptroller is guided by "his personal responsibility and commitment to his oath of office”. (Cf. Sgaglione v Levitt, 37 NY2d 507, 512.) The Legislature is powerless to mandate how the Comptroller, an independently elected official, is to exercise his constitutional discretion. (Sgaglione v Levitt, supra.) The statute under review in this case is invalid since it purports to mandate that the Comptroller exercise his supervision over a particular topic in a particular manner. Moreover, it would impose upon the Comptroller the power and duty to conduct a study and review not merely of accounts but of a subject of administrative and operational concern in the management of the authority’s business. The Comptroller’s function was perceived by the constitutional draftsmen as *725 providing an independent oversight of the accounts of previously unchecked public corporations.
Accordingly, the order of the Appellate Division should be modified to declare section 153-c of the Public Authorities Law unconstitutional in its entirety and, as modified, affirmed.
Chief Judge Breitel and Judges Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order modified, with costs to plaintiffs, in accordance with the opinion herein and, as so modified, affirmed.

 The court dismissed the complaint against defendants Governor Hugh Carey and State Comptroller Authur Levitt on the ground that they were not proper parties to this action. This issue is not before us. We do agree with Special Term, however, that the governmental plaintiffs, as well as the institutional representative of the bondholders, have sufficient standing to maintain this action. (See Matter of Jeter v Ellenville Cent. School Dist., 41 NY2d 283, 287.)