14

PHILIP PRUITT, Appellant, v ROCKEFELLER CENTER PROPERTIES, INC., et al., Respondents.

First Department, May 21, 1991

## APPEARANCES OF COUNSEL

*Sidney B. Silverman* of counsel *(Silverman, Harnes & Obstfeld,* attorneys), for appellant.

*Russell E. Brooks* of counsel *(Melanie L. Cyganowski* and *Steven T. Potts* with him on the brief; *Milbank, Tweed, Hadley & McCloy,* attorneys), for Rockefeller Center Properties, Inc., and others, respondents.

*Marvin Schwartz* of counsel *(Steven L. Holley* with him on the brief; *Sullivan & Cromwell,* attorneys), for Goldman, Sachs and Co. and another, respondents.

*Robert G. Cohen* of counsel *(Carl D. Liggio,* attorney), for Arthur Young, respondent.

*Joseph Di Benedetto* of counsel *(Irma Nimetz* with him on the brief; *Winston & Strawn,* attorneys), for L.W. Ellwood & Company, respondent.

## OPINION OF THE COURT

SULLIVAN, J. P.

On the September 1985 public offering of such shares at $20 per share, plaintiff purchased 100 shares of the common stock of Rockefeller Center Properties, Inc. (RCPI), a Delaware corporation owning two promissory notes in the total face amount of $1.3 billion issued by the two partnerships which own 12 buildings forming the core of Rockefeller Center, as

well as an option, excercisable on December 31, 2000, to convert such notes into a 71.5% interest in the partnerships.

On December 13, 1985, three months after the public offering, plaintiff commenced this action against RCPI, its directors, the legal underwriters of the public offering and the independent certified accountant and real estate appraiser involved therein, alleging violations of sections 11 and 12 of the Securities Act of 1933 (15 USC §§ 77k, 77*l*). Specifically, plaintiff charged that a September 12, 1985 prospectus, issued in connection with the public offering, was materially false and misleading in that it contained financial projections which improperly assumed that one of the Rockefeller Center tenants, the National Broadcasting Co. (NBC), would renew its lease, when, in fact, it was known that NBC wished to relocate. The complaint also alleged that the prospectus' projections of the returns to be realized by purchasers of RCPI shares were based upon the unreasonable and false assumptions that NBC would renew its lease at projected fair market rents which would increase at 6% per annum, resulting in a $103.08 per square foot rate for leases signed in 2000, and that there would be a 1% vacancy rate. The complaint also challenged the prospectus' unreliable and faultily premised $1.6 billion appraised value of the property, which was substantially higher than defendants' own independent appraiser's valuation. Finally, the complaint alleged that the prospectus failed to disclose that RCPI's status as a real estate investment trust (REIT) under the Federal tax laws was in jeopardy because, *inter alia,* the property securing RCPI's notes, i.e., the twelve Rockefeller Center buildings, does not have a fair market value in excess of the $1.3 billion face amount of the notes, a REIT requirement. If it did not qualify for REIT status, RCPI's income would be taxed at the corporate level, thereby reducing stockholder dividends. Defendants answered, denying the material allegations of the complaint and asserting several affirmative defenses.

In September 1987, plaintiff moved for certification of a plaintiff class consisting of all purchasers of RCPI stock or debentures in the public offering and the aftermarket through December 13, 1985. Defendants cross-moved to have plaintiff post a $250,000 undertaking pursuant to section 11 (e) of the Securities Act of 1933. On January 12, 1988, while the motions were pending, after it had been publicly disclosed that NBC was negotiating a renewal of its Rockefeller Center lease, the court requested additional submissions with respect

thereto. Defendants' submission indicated that under its new lease NBC had obtained terms so favorable as to be substantially equivalent to those available in New Jersey, to which NBC had been actively seeking relocation. Plaintiff's papers demonstrated that the newly negotiated lease's economic effect was as adverse to him and the other class members as would NBC's relocation elsewhere. By order of May 6, 1988, leave was granted to plaintiff to serve an amended complaint and, on the basis thereof, to move for class action status.

Promptly after service of the repleaded complaint, plaintiff moved for class action certification and served a demand for document discovery as well as a notice to take depositions. Defendants renewed their request for a $250,000 undertaking and cross-moved for a protective order with respect to plaintiff's discovery demands on the ground that discovery as to class issues should precede discovery as to substantive issues. The court refused defendants' request for an undertaking and denied class certification with respect to purchasers of RCPI debentures. The motion with respect to RCPI stock purchasers, however, was held in abeyance, pending defendants' deposition of plaintiff on the issues relevant to class action certification.

At his deposition plaintiff testified that he had attended Northwestern University, majoring in business administration and accounting, after which he was employed by various businesses as well as several New York City brokerage firms. In 1969, he was appointed an assistant administrator of the Small Business Administration, in charge of minority enterprise, from which, in 1970, he resigned when, he claims, he realized that the position was merely ceremonial. He then founded an insurance company in Philadelphia, serving as its president and treasurer until its merger with another company in 1973. He also developed an advisory company providing consulting services to Opportunity Industrial Center, a Philadelphia-based black self-help organization. He thereafter returned to New York as executive director in communications, of Health Providers Association, which represented 500 physicians specializing in Medicare and Medicaid health care services. He was also president of the accounting firm of Thompson and Pruitt, which represented an association of New York City private ambulance owners. In 1982, he was appointed executive director of Central Harlem Meals on Wheels, a provider of food and other necessities to senior citizen shut-ins. In 1984, plaintiff started an investment coun-

selling service, whose primary client was Percy Sutton, an individual with substantial media interests, particularly in television and radio. Since 1986, plaintiff has been employed full time by Mr. Sutton's various enterprises, advising on investments, arranging the financing of television productions and negotiating contracts.

Plaintiff also testified at his deposition about his purchase of 100 shares of RCPI stock from defendant Shearson Lehman Brothers, Inc. on the public offering. According to plaintiff, he learned shortly thereafter from a major New York City realtor that the appraisal contained in the prospectus was highly overstated and that the projections of annual 6% or 7% increase in the market rent for office space were, due to a glut in office space, irresponsible, causing him to seek legal redress. Plaintiff answered, "yes", when question about whether he still owned 100 shares of RCPI stock. In fact, he had already sold 90 of his shares. Prior to signing the deposition, plaintiff noted the error, corrected the transcript and promptly advised defendants. He was also asked about his willingness and ability to pay the litigation expenses if class status were granted, and responded that he was committed to an expenditure of $25,000 and that if more were required he would consult further with counsel.

After the completion of his deposition, plaintiff renewed his class certification motion in supplemental papers setting forth his educational and business background, basis for bringing the action and familiarity with the claims and asserting that he was a person "of substantial means", who was "able" to finance the litigation. He indicated that since RCPI had issued 9,910 stock certificates in its first three months as a public company the number of class members would exceed the number required for class action certification. The IAS court denied class certification, holding that plaintiff had not shown that any holders of RCPI stock had incurred damages similar to those allegedly sustained by him, that his self-imposed $25,000 limitation on litigation expenses and his less than forthright testimony indicated he would not be an adequate class representative and that the evidence failed to show the superiority of class action over other methods as a dispute-resolution mechanism. We reverse and grant class action certification.

█ CPLR article 9 ("Class Actions") is modeled on rule 23 of the Federal Rules of Civil Procedure, the policy of which "is to favor the maintenance of class actions and for a liberal

interpretation." *(Brandon v Chefetz,* 106 AD2d 162, 168.) Appellate courts in this State have repeatedly held that the class action statute should be liberally construed. *(Matter of Colt Indus. Shareholder Litig.,* 155 AD2d 154, 158-159, *mod on other grounds* 77 NY2d 185.)* Thus, "any error, if there is to be one, should be * * * in favor of allowing the class action." *(Esplin v Hirschi,* 402 F2d 94, 101, *cert denied* 394 US 928.) Since a class action "may, as a practical matter, be the only available method for the determination of the issues raised" *(King v Club Med,* 76 AD2d 123, 128), it is particularly appropriate where, as here, class members have allegedly sustained damages in amounts insufficient to justify individual actions. Inasmuch as the class is large—37,500,000 RCPI shares were sold and 9,910 certificates issued through December 13, 1985—and each class member's stake in the litigation is relatively small, it would be impractical and inefficient for individual class members to prosecute separate actions. Moreover, the class action remedy is "frequently utilized" in claims of alleged securities law fraud where a significant number of purchasers are affected. *(Harris v Palm Springs Alpine Estates,* 329 F2d 909, 913.)

▉ The prerequisites to class action certification are specifically set forth in CPLR 901. This action, involving thousands of class members, clearly meets the statute's numerosity requirement. (CPLR 901 [a] [1].) As the IAS court found, the common questions of law and fact with respect to, *inter alia,* the truth or falsity of the prospectus' statements predominate over individual issues. And, as has been oft-times stated, in fraud cases, where "identical representations are made in writing to a large group", individual questions of reliance do not justify denial of class status. *(King v Club Med, supra,* at 127; *Weinberg v Hertz Corp.,* 116 AD2d 1, 6-7, *affd* 69 NY2d 979.)

While defendants argue that "the record did not show that any other RCPI stock purchasers had lost money on their stock", it is clear that large numbers of RCPI purchasers, both in the initial offering and in the aftermarket, sold their shares at a loss. The IAS court had before it documents showing the trading volume and prices of such shares on each day during the period between the date the shares were first traded, September 12, 1985, and the commencement of the action, December 13, 1985. The price of the shares during that period equaled or exceeded the $20 offering price only once, on September 12, the date the stock was initially offered. The

market price steadily declined from a closing price of $19.875 on September 12, 1985 to $17.875 on December 13, 1985. Clearly, the sellers of the 15,993,500 shares through December 13, 1985 either paid $20 per share at the public offering and sold at a lower price or purchased in the declining after-market and paid more for their shares than they received on their sales. It can reasonably be concluded that the class of persons who sold RCPI stock at a loss through December 13, 1985 consists of thousands. *(See, Weiss v Tenney Corp.,* 47 FRD 283 [SD NY 1969].)* As already noted, nearly 10,000 stock certificates were issued in that period.

■ Plaintiff's claim is also typical of the claims of other members of the class since it arises out of the same course of conduct as the class members' claims and is based on the same cause of action. *(See, Friar v Vanguard Holding Corp.,* 78 AD2d 83, 99.)* To be typical, "it is not necessary that the claims of the named plaintiff be identical to those of the class". *(Super Glue Corp. v Avis Rent A Car Sys.,* 132 AD2d 604, 607.)* The requirement is satisfied even if the class representative cannot personally assert all the claims made on behalf of the class. *(Weinberg v Hertz Corp., supra,* 116 AD2d, at 7.)* Here, however, plaintiff's claims are identical to those of the other members of the class since he alleges, as would they, that he purchased the stock on the basis of a false and misleading prospectus. Both he and the class assert violations of Securities Act §§ 11 and 12. That plaintiff sold some of his stock at a loss and retained the balance, which the IAS court relied upon in its finding of an absence of typicality, is significant only on the issue of damages. Since the typicality requirement relates to the nature of the claims and the underlying transaction, not the amount or measure of damages, that plaintiff's damages may differ from those of other members of the class is not a proper basis to deny class certification. *(Vickers v Home Fed. Sav. & Loan Assn.,* 56 AD2d 62, 65.)* Thus, in *Klurfeld v Equity Enters.* (79 AD2d 124), the plaintiff, alleging a breach of fiduciary duty to a corporation's minority shareholders whom he sought to represent, challenged a proposed merger involving the corporation on the ground it had as its sole purpose the forced liquidation of the minority shareholders' stock. The court held that the difference in price paid by minority stockholders for their shares did not bar class action certification since the "claim that the proposed merger violates the rights of the minority shareholders is integral to each share of stock, regardless of

the price paid for the stock." *(Supra,* at 131-132.) Similarly, here, plaintiff's claim that the stock was bought on the basis of a false and misleading prospectus affects all the shares purchased in the public offering. That some purchasers may have sold some or all of their stock at varying prices, thereby suffering different damages, does not bar class certification. In any event, however, even on this point, since plaintiff both sold and retained shares purchased at the public offering, his claims would be representative of those who sold and those who retained their stock and thus meets the typicality requirement.

■ The IAS court found, erroneously, in our view, that the class action remedy was not, in this instance, a superior method of claim adjudication, since "each class member would require different and complex calculations of damages." Damage calculation for a Securities Act § 11 violation is neither complex nor complicated. As to class members who sold their stock prior to December 13, 1985, the commencement date of the action, damages under section 11 (e) are measured by the difference between the purchase and sales price. As to all other class members, the stock must be valued as of December 13, 1985; damages are the lesser of the difference between the purchase price and the December 13, 1985 value or the actual loss suffered by those purchasers who sold their RCPI shares after December 13, 1985, but prior to judgment. In any event, the complexity of the damage issue is not a bar to class action certification. In *Weinberg v Hertz Corp.* (116 AD2d 1, *supra),* an action to recover certain allegedly illegal car-rental charges, this court granted class action certification notwithstanding that damages among the class members, 2.8 million renters of Hertz automobiles within this State during the period in question, would vary considerably because some of them "might have been subjected to less than all of the conduct complained of" *(supra,* at 6; *see, Super Glue Corp. v Avis Rent A Car Sys.,* 132 AD2d 604, *supra; see also, Simon v Cunard Line,* 75 AD2d 283; *Stellema v Vantage Press,* 109 AD2d 423).

Nor, in resolving the superiority requirement, is it significant that a class action would impose enormous monetary liability on the wrongdoer but provide only a small recovery for each member of the class. This argument has been uniformly rejected since it ignores the public benefit aspect of the class action. "The class action is seen as a means of inducing socially and ethically responsible behavior on the part of large

and wealthy institutions which will be deterred from carrying out policies or engaging in activities harmful to large numbers of individuals." *(Friar v Vanguard Holding Corp., supra,* 78 AD2d, at 94.) Without the benefit of the class action, these institutions could act with impunity in such matters "since, realistically speaking, our legal system inhibits the bringing of suits based upon small claims" *(supra,* at 94). Similarly, in this case, since the relatively insignificant amount of damages suffered by many members of the class makes individual actions cost prohibitive, and the large number of class members renders consolidation unworkable, a class action is not only superior but, indeed, the only practical method of adjudication. *(See, Super Glue Corp. v Avis Rent A Car Sys., supra,* 132 AD2d, at 607-608.)

■ In denying class action certification, the IAS court also found plaintiff to be an unsuitable class representative. Whether the representative party "will fairly and adequately protect the interests of the class" (CPLR 901 [a] [4]) involves a number of considerations—whether a conflict of interest exists between the representative and the class members *(see, Super Glue Corp. v Avis Rent A Car Sys., supra,* at 607), the representative's background and personal character, as well as his familiarity with the lawsuit, to determine his ability to assist counsel in its prosecution and, if necessary, "to act as a check on the attorneys" *(Tanzer v Turbodyne Corp.,* 68 AD2d 614, 620) and, significantly, the competence, experience and vigor of the representative's attorneys *(Super Glue Corp. v Avis Rent A Car Sys., supra,* at 607) and the financial resources available to prosecute the action *(Stern v Carter,* 82 AD2d 321, 340).

■ On review of the record against the relevant factors, it is clear that plaintiff has met the statutory adequacy and fairness of representation standard. There is not even a hint of any adverse interest. His counsel is experienced in class action litigation, particularly in the securities law area. Plaintiff is well educated and has pursued a career in business, with an emphasis on securities and investments. As is clear from the transcript of his deposition, he is familiar with the substantive allegations of the complaint. He has also been involved in charitable and community affairs, further evidencing his fitness to discharge his fiduciary obligations *(see, City of Rochester v Chiarella,* 65 NY2d 92, 100) and act zealously and faithfully in the interest of the other class members.

█ Although acknowledging his suitability in terms of background and experience, the IAS court found that plaintiff was not an adequate class representative on two grounds, neither of which justifies denial of class action certification. The court found that plaintiff had been "less than forthright" in his deposition testimony with respect to the number of RCPI shares he owned. As already noted, however, plaintiff, prior to signing the deposition noted the error in his answer, corrected the transcript and promptly advised defendants. There is no reason to believe plaintiff lied as to his RCPI holdings, especially since an accurate answer, stating that he had both sold and retained RCPI stock, would have enhanced his standing as a representative of a class, some of whose members had sold while others retained the stock. Furthermore, whether plaintiff, on the day of the deposition, owned the 100 shares of RCPI stock, which is what the question sought to ascertain, was irrelevant to plaintiff's qualifications as the class representative. Class certification should not be denied on the basis of an inaccurate answer as to a matter irrelevant to the class certification question or the merits of the case, which, in this matter, turns on the truth or falsity of representations in the prospectus. *(Gibb v Delta Drilling Co.,* 104 FRD 59, 76 [ND Tex 1984].)

█ Although plaintiff stated that he was prepared to expend $25,000, a sum sufficient to pay the cost of notifying the members of the class and the other expenses of the case, and, if additional funds were required, to consult further with counsel, the court held that plaintiff did not carry his burden under CPLR 901 (a) (4) because of his "unwillingness to commit to whatever expenditures [would be] necessary" to prosecute the action. This was error. While the ability and willingness of a class plaintiff to bear the cost of litigation is relevant to a determination of whether the plaintiff will adequately protect the interests of the class, "financial status * * * is but one factor to be considered". *(Stern v Carter, supra,* 82 AD2d, at 340.) In any event, as this record discloses, plaintiff is a person of means, capable of financing the litigation, and defendants have failed to present evidence to the contrary. Under such circumstances, a class representative need show no more. *(See, supra,* at 340.) If, as is claimed, there is a "lack of detail" with respect to plaintiff's finances, defendants have only themselves to blame. Despite extensive questioning at his deposition, plaintiff was never asked about the nature of his assets or the amount of his income. Defendants

were apparently satisfied by plaintiff's testimony that he was able to finance the litigation.

Moreover, the IAS court's holding that a class representative must commit whatever funds are required to prosecute the action is without legal support. Since the policy underlying class actions is to "enable individuals of modest means to vindicate legal rights" *(Klein v Checker Motors Corp.,* 87 FRD 5, 6 [ND Ill 1979]), a requirement of a commitment of "vast financial resources" *(supra,* at 6) would frustrate that goal. Plaintiff's commitment of $25,000 and decision to consult with counsel if more is needed is, it seems to us, indicative of a responsible approach to a class representative's obligations.

Defendants also argue that class certification is prohibited since CPLR 901 (b) prohibits class actions to recover a "penalty, or a minimum measure of recovery" unless the statute creating or imposing such remedy "specifically authorizes the recovery thereof in a class action" and Securities Act § 11 (e) provides for a penalty or a statutory minimum measure of recovery, but does not expressly authorize class action recovery. The IAS court did not address this issue. In our view, in advancing this argument, defendants misconstrue section 11 and ignore relevant case law. A statute that creates or imposes a "minimum measure of recovery" is one that, upon proof of its violation, provides for the recovery of some fixed minimum amount, without regard to the amount of damages suffered. In *Burns v Volkswagen of Am.* (118 Misc 2d 289, *affd* 97 AD2d 977, *lv dismissed* 61 NY2d 604), for example, a claim for recovery of the $50 minimum amount provided by General Business Law § 349 (h) and § 350-d (3) (now § 350-e [3]), which permit an individual injured by a deceptive business practice or false advertising to collect his actual damages or $50, whichever is greater, was denied class action certification. Securities Act § 11 (e) does not authorize a minimum recovery.* Those class members who bought on the

---

* Insofar as is relevant, section 11 (e) provides: "(e) The suit authorized under subsection (a) may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought".

public offering and sold before the commencement of this action will recover, not a specified minimum amount, but their out-of-pocket loss, ranging from $.125 to $2.375 per share.

We also reject defendants' argument that Securities Act § 11 authorizes recovery of a penalty. In determining whether a statute imposes a penalty, courts look primarily to the statute's description of the recovery it authorizes. *(See, Cox v Lykes Bros.,* 237 NY 376, 379; *Bogartz v Astor,* 293 NY 563, 565.)* Since a section 11 recovery, which the statute describes as "damages", is virtually identical in form to the traditional common-law remedies for compensatory relief, it is not one to recover a penalty, and class actions brought thereunder are not proscribed by CPLR 901 (b).

The argument that Securities Act § 11 imposes a penalty is based, in part, on a confusion of laws which are penal in nature in that they create liability where none existed before with those which provide for a penalty as redress, rather than a compensatory recovery. Only those actions brought under the latter type of statute are included in CPLR 901 (b)'s penalty exclusion. Thus, for example, 42 USC § 1983, which creates liability for civil rights violations where none existed before, penalizes those who violate it but does not provide for the recovery of a penalty. *(See,* 2 Weinstein-Korn-Miller, NY Civ Prac ¶ 901.22.)* Securities Act § 11 similarly creates liability where none existed before, in that it eliminates the common-law requirements of reliance, causation and scienter in certain stock fraud cases. Thus, since it imposes liability with respect to conduct not proscribed in the past, section 11 is, as a number of cases have held, penal as to those who violate it. None of these cases, however, holds that section 11 authorizes the recovery of a penalty. In fact, in *Globus v Law Research Serv.* (418 F2d 1276, *cert denied* 397 US 913), the case cited by defendants for the proposition that section 11 seeks "to deter negligence by providing a penalty for those who fail in their duties" *(supra,* at 1288), the court noted that the section is "restrict[ed] * * * to compensatory damages" *(supra,* at 1284). Thus, while section 11's imposition of liability in cases where none existed before may be "penal as to the offender", it is "remedial as to the sufferer" *(Cox v Lykes Bros., supra,* 237 NY, at 380). Hence, the recovery authorized thereunder is compensatory in nature.

Nor, as defendants contend, does the fact that class members may have profited because they received dividends on

their shares demonstrate that section 11's purpose is to deter and penalize, rather than compensate. The RCPI stock dividend reflects interest on a loan at below-market rates. Had plaintiff and the other class members invested their funds elsewhere, they could have received greater earnings.

Accordingly, the order of the Supreme Court, New York County (Carol H. Arber, J.), entered on or about February 16, 1990, denying plaintiff's motion for class action certification should be reversed, on the law, and on the facts, and in the exercise of discretion, with costs and disbursements, and the motion granted.

ROSENBERGER and WALLACH, JJ., concur with SULLIVAN, J. P.; KUPFERMAN and SMITH, JJ., dissent and would affirm for the reasons stated by ARBER, J.

Order, Supreme Court, New York County, entered on or about February 16, 1990, denying plaintiff's motion for class action certification is reversed, on the law, and on the facts, and in the exercise of discretion, with costs and disbursements, and the motion granted.