A. HOLLY PATTERSON, as President of the Board of the Jones Beach State Parkway Authority, et al., Respondents-Appellants, v HUGH L. CAREY, as Governor of the State of New York, et al., Defendants, and LOUIS J. LEFKOWITZ, as Attorney-General of the State of New York, Appellant-Respondent.

Third Department, May 13, 1976

*Louis J. Lefkowitz, Attorney-General, pro se (Grace K. Banoff* and *Ruth Kessler Toch* of counsel), for appellant-respondent.

*Meyer, English & Cianciulli, P.C. (Bernard S. Meyer* of counsel), for A. Holly Patterson and others, respondents-appellants.

*Dewey, Ballantine, Bushby, Palmer & Wood (Hugh N. Fryer* of counsel), for Chase Manhattan Bank, N.A., respondent-appellant.

*Hawkins, Delafield & Wood (Charles L. Kades* and *Clarence Fried* with him on the brief), for New York State Bridge Authority, *amicus curiae.*

*Kissam & Halpin (Anthony S. Genovese* and *Michael F.*

*Fitzgerald* with him on the brief), for Automobile Club of New York, Inc., *amicus curiae.*

KOREMAN, P. J. This action involves the constitutionality of section 153-c of the Public Authorities Law (L 1975, ch 17), which (1) rolled back the toll on the Southern State Parkway from 25 cents to 10 cents until compliance with the subsequent provisions, and (2) established a 120-day waiting period for further toll increases during which a new public disclosure, review and hearing procedure is followed.

Plaintiffs consist of the individual members of the Board of Jones Beach State Parkway Authority (hereinafter, the Authority) and the Chase Manhattan Bank, as trustee for the bondholders of the bonds of the Authority. The Authority, created by chapter 70 of the Laws of 1933, from which section 152 of the Public Authorities Law (L 1939, ch 870) was derived, has the power pursuant to subdivision 5 of section 153-b, "[t]o charge tolls for the use of the part of Southern state parkway improved by the authority subject to and in accordance with any agreements with bondholders made as hereinafter provided. The toll shall be ten cents unless the revenues from such tolls and the income from the facilities authorized by the foregoing provisions of this section are insufficient to meet all obligations of such agreements and to pay the costs of operating and maintaining the parkways and facilities operated and maintained by the authority pursuant to the foregoing provisions of this section. The revenue from such tolls and the income from such facilities shall be used only to meet such obligations and to pay the cost of constructing, reconstructing, operating and maintaining such parkways and facilities."

Subdivision 1 of section 158-a, entitled "Covenants of the state" provides as follows: "The state of New York does pledge to and agree with the holders of any bonds issued pursuant to this act after January first, nineteen hundred thirty-nine that it will not limit or alter the rights hereby vested in the authority to construct, reconstruct, operate and maintain the parkway, bridges and other improvements, or any of them, and to collect revenues therefrom as authorized in this title insofar as such rights may be necessary in order that the authority may fulfill the terms of any agreements made with the holders of such bonds and that it will not in any way impair the rights and remedies of the holders of such bonds until the bonds, together with interest thereon, with interest

on any unpaid installments of principal and interest and all costs and expenses in connection with any suits, actions or proceedings by or on behalf of the bondholders are fully met and discharged."

On the basis of an independent study commissioned in 1974, the Authority adopted a resolution raising the toll on the Southern State Parkway from 10 to 25 cents, effective January 1, 1975, in order to undertake and complete a long-range capital improvement program which involves widening the parkway in parts and making major structural and safety improvements. The report also found that an increase of 5 cents, thus making the toll 15 cents, would be sufficient to meet operating expenses until the early or mid-1980's. Lastly, the report made various projections of traffic diversion from the Southern State Parkway due to increased tolls.

On February 21, 1975, however, the office of the State Comptroller issued a report which concurred with the finding that only a 5 cents increase would be needed to cover revenue needs for debt service, operation and maintenance through 1981, and concluded that any major capital improvement program should be deferred until such time as new studies are made, involving long-range transportation choices, the energy crisis, increased traffic congestion, and other problems.

On March 11, 1975, chapter 17 of the Laws of 1975 was approved by the Governor, adding section 153-c to the Public Authorities Law, which rolled back the toll to 10 cents and established the following procedures to be followed by the Authority prior to any future toll increases: (1) the submission to the Comptroller of a detailed report, not less than 120 days prior to the effective date of the proposed increase, explaining its necessity; (2) the publication by the Comptroller of his recommendations concerning the increase within 60 days; (3) the holding of a public hearing not less than 15 days prior to the effective date; and (4) the subsequent reconsideration by the Authority of the proposed increase and then the taking of such action as the Authority deems necessary and advisable.

Special Term held that subdivision 1 of section 153-c rolling back the toll was unconstitutional, but that the other provisions of the statute (subds 2 through 4) relating to the 120-day waiting period during which reports are filed and a public hearing held, are constitutional and valid (83 Misc 2d 372).

On this appeal plaintiffs contend that section 153-c violates the provisions of clause 1 of section 10 of article I of the

United States Constitution that "No State shall \* \* \* pass any \* \* \* Law impairing the Obligation of Contracts". Plaintiffs take the position that the State's pledge to the bondholders contained in subdivision 1 of section 158-a of the Public Authorities Law constitutes a contract between the State and the bondholders, binding upon subsequent Legislatures and that by the terms of this statutory agreement, the State of New York "will not limit or alter the rights hereby vested in the authority to construct \* \* \* and to collect revenues therefrom \* \* \* in order that the authority may fulfill the terms of any agreements made with the holders of such bonds and that it will not in any way impair the rights and remedies of the holders of such bonds". While the defendant does not dispute that the pledge on the part of the State constitutes a contract with the bondholders, the defendant contends that section 153-c is not an unconstitutional impairment of the State's obligation under said contract and, in any event, that section 153-c is a valid exercise of the State's police power.

In our view, Special Term correctly concluded that the 10-cent rollback provision contained in subdivision 1 of section 153-c constitutes an unwarranted impairment of the State's pledge to bondholders as provided in subdivision 1 of section 158-a. There can be no question that an agreement not to limit or alter the rights of the Authority to collect revenues and fix appropriate tolls is violated by legislation mandating that the toll be restored to the 10-cent fee which was in effect prior to the increase to 25 cents granted by the Authority, albeit for only 120 days. Although, as Special Term found, the loss of revenue during the 120-day hiatus would not endanger the security of the bonds or precipitate a default, the fact remains that the Legislature has reversed a determination of the Authority and infringed upon the Authority's power to set tolls according to its determination of its own needs and obligations. Having determined that the toll rollback provision constitutes an impairment of a constitutionally protected contract obligation, the fact that it may be small becomes immaterial *(Sgaglione v Levitt,* 37 NY2d 507, 513). This is not to say, however, that the Contracts Clause of the United States Constitution must be kept inviolate under any circumstances or conditions, since it is still subject to the police power of the State. The question then arises as to when the State's reserved police power may be exercised to override the sanctity of contracts, and in this context, the degree of impairment

does become a factor. On this issue, the court in *Home Building & Loan Assn. v Blaisdell* (290 US 398, 426) stated, "While emergency does not create power, emergency may furnish the occasion for the exercise of power." It was also stated in *Blaisdell* (p 439) that "whatever is reserved of state power must be consistent with the fair intent of the constitutional limitation of that power. The reserved power cannot be construed so as to destroy the limitation, nor is the limitation to be construed to destroy the reserved power in its essential aspects. They must be construed in harmony with each other." The court concluded in *Blaisdell* that an emergency existed which furnished a proper occasion for the exercise of the police power, that the legislation involved was addressed to a legitimate end, and that the means were reasonable under the circumstances. While an emergency is often the motivating force for the exercise of the police power, the validity of a statute impairing contractual rights seems to be controlled more by a balancing of interests than by the mere existence of an emergency situation (see *East N. Y. Bank v Hahn,* 326 US 230; *Matter of Department of Bldgs. of City of N. Y. [Philco Realty Corp.],* 14 NY2d 291). The rationale of the authorities is that, although the State was impairing the contract obligation, the legislation in question was a reasonable exercise of the reserved power of the State to protect the vital interests of the community. Given the existence of a contract impairment, therefore, our inquiry is directed to whether the situation or condition sought to be remedied is of such dimensions as to warrant the exercise of the police power, whether the relief afforded is addressed to a legitimate end and enacted for the protection of a basic interest of society, and, further, whether the measures undertaken, as contained in the legislation, are reasonable and appropriate to that end.

Under the facts of the instant case, defendant argues that the toll rollback was a reasonable exercise of the State's police power for the reason that it was enacted for the purpose of alleviating the traffic congestion on the local streets resulting from motorists' attempting to avoid paying the toll increase on the parkway. We find no merit to this contention. While the relief from traffic congestion may be a proper concern for the State's police power (see 1 Anderson, New York Zoning Law and Practice [2d ed], § 7.21), to be justified as an impairment of the obligations of a contract on that basis, legislation must have both such purpose as its end and be reasonably

related thereto. As Special Term correctly concluded, since there is no allusion to any traffic emergency contained in section 153-c, and the effect of the statute merely postpones the toll increase for 120 days, after which time presumably traffic will again become congested, it cannot be said that the legislation was enacted to alleviate the traffic situation, nor that the toll rollback provision is reasonably related or appropriate to that end, even if such legislative intent did exist. In *United States Trust Co. of N. Y. v State of New Jersey* (134 NJ Super 124, affd 69 NJ 253), relied on by defendant and adverted to by all parties to this appeal, legislation was upheld repealing a statutory convenant between the States of New Jersey and New York and the holders of bonds issued by the Port Authority. The covenant proscribed the Port Authority's acquiring or operating passenger rail transit lines, a measure designed to protect the security of the holders of Port Authority bonds. Unlike the case at bar, however, it is clear that in *United States Trust Co. of N. Y. v State of New Jersey (supra)* the urgent need for additional mass transit facilities in the New York—New Jersey metropolitan area, in order to facilitate the movement of millions of people at a reasonable cost, amplified by the energy and pollution crises, was a legitimate State interest which the legislation was designed to remedy and which overcame the impairment of the bondholders' contracts.

The additional claim that the statute (Public Authorities Law, § 153-c) was intended to remedy an *ultra vires* act on the part of the Authority in increasing the toll as it did can have no relevancy to this action concerning the constitutionality of that statute. Furthermore, since review of an allegedly *ultra vires* act would properly be the subject of an article 78 proceeding, and is not a legislative function, it could not serve to justify the impairment of a contractual obligation.

Having thus concluded that the toll rollback provision (Public Authorities Law, § 153-c, subd 1) is constitutionally void as violative of the Contracts Clause, we now consider whether the procedures set forth in subdivisions 2 through 4 of the statute also constitute an impairment of the State's contractual obligation to the bondholders. These procedures established a waiting period of not less than 120 days, during which a new public disclosure, review and hearing procedure must be followed, before the Authority may enact any future increase in tolls. The pledge to the bondholders under section

158-a of the Public Authorities Law is that the State will not limit or alter the rights vested in the Authority to perform its statutory functions or in any way impair the rights and remedies of the bondholders. The disclosure provisions of the statute in question make clear that the Authority still retains ultimate and unfettered power to determine toll charges and that the rights of the Authority to perform its duties are not altered; nor can it be said that the security of the bondholders is impaired thereby. The contentions that the disclosure procedures may have a chilling effect on the Authority's prerogatives under the statute and subject it to political pressures or interfere with its freedom in making decisions have no bearing on the constitutionality of such procedures, since they neither interfere with the Authority's discretion in increasing the tolls, nor do they impair the exercise of its independent judgment. Furthermore, the mere fact that there is a waiting period need not cause a loss in revenues, since the final toll charge arrived at by the Authority may take into account any delay in implementation. Whereas we are in agreement with the conclusion arrived at by Special Term that the disclosure provisions are not violative of the Contracts Clause, we do not reach the question of whether such provisions constitute a reasonable exercise of the police power. Since, as we hold, the provisions do not impair the obligation to the bondholders in any degree, there was no occasion for Special Term to attempt to justify what it found to be a technical impairment caused by the exercise of the police power.

We observe, finally, that by chapter 723 of the Laws of 1975 the Legislature enacted the same disclosure procedures as contained in subdivisions 2 through 4 of section 153-c to apply to all toll increases for all public authorities (Public Authorities Law, § 2504, eff. July 1, 1976). The stated legislative findings and purpose in enacting this recent legislation is to require a full and public disclosure of the financial status and the need for additional revenues, to indicate the soundness of the internal process of public authorities and also to help gain public acceptance for a necessary toll increase. Additionally, the Legislature found, "Such a procedure would not limit or alter the rights vested in an authority or commission to establish and collect tolls or other user fees. It would not in any way impair the rights and remedies of bondholders nor limit or impair the power of an authority or commission to accomplish its stated purpose."

While section 2504 of the Public Authorities Law does not become effective until July 1, 1976, a similar legislative purpose is apparent in the enactment of the disclosure procedures in section 153-c of the Public Authorities Law.

The order and judgment should be affirmed, without costs.

MAHONEY, J. (concurring in part and dissenting in part). While we agree that subdivision 1 of section 158-a of the Public Authorities Law constitutes a contract between the State and the Authority bondholders, we disagree with the holding of the majority that section 153-c of the Public Authorities Law (L 1975, ch 17) is a constitutionally impermissible impairment of that contract.

We are not presently faced with a specific constitutional nonimpairment clause as in those cases dealing with the State Retirement System (NY Const, art V, § 7) where all legislation, regardless of its *de minimis* effect, is unconstitutional, per se, if it interferes with benefits to which retirees are entitled *(Sgaglione v Levitt,* 37 NY2d 507, 513). The bondholders herein, pursuant to the pledge made by the State, are entitled only to the absence of any action by the State in connection with the Authority's right to collect revenues in the form of tolls that would impair the Authority's ability to timely meet its bond obligations (Public Authorities Law, § 158-a, subd 1). The passage of section 153-c of the Public Authorities Law does not constitute such action on the part of the State. Indeed, the very study relied upon by the Authority to increase its tolls by 150% negates the necessity for such an increase, as does the Comptroller's report. While we agree that the legislation sought to be struck down on constitutional grounds did not have as its purpose the alleviation of traffic congestion, as argued below in justification of the invocation of the State's police power, and that the measures directed to be undertaken by the Authority were not appropriate to that end, we cannot agree that such finding makes the legislation constitutionally defective. While the relief afforded in legislation should be addressed to a legitimate purpose and the measures as delineated in the statute should be appropriate to that end, the argument that the subject legislation has as its purpose "traffic control" should not be given the impact of law where, as here, the purpose of the legislation is time, rather than traffic control, and the measures directed to be taken in the interim are designed to determine whether it is in the

public interest to increase drastically the toll for vehicular traffic.

While the Legislature may delegate the power to fix rates and charge tolls to an Authority, such a delegation, regardless of the breadth of the statutory language is not limitless and is subject to legislative correction when abused *(Carey Transp. v Triborough Bridge & Tunnel Auth.,* 38 NY2d 545, 553; *Matter of Russell v Jones Beach State Parkway Auth.,* 80 Misc 2d 698, 700).* This general reservation of legislative control to monitor possible abuse is made specific in this case by the very language of section 158-a of the Public Authorities Law, wherein, in pertinent part, it is stated, "The state of New York does pledge to and agree with the holders of any bonds * * * that it will not limit or alter the rights hereby vested * * * to collect revenues * * * *as such rights may be necessary in order that the authority may fulfill the terms of any agreements made with the holders of such bonds".* (Emphasis supplied.) The Authority concedes that the 150% increase in the toll rate is *not necessary* to fulfill its agreement with the bondholders. It follows, therefore, that section 153-c, which rolled back the toll, did not *impair* any right secured by the contract. Indeed, by rolling back the toll from 25 cents to 10 cents, thereby insuring continued use by the public of the highway system, which use has been adequate to produce revenues sufficient to pay the Authority's obligations, rather than causing less use because of the large toll increase, the legislative act under attack insures that the obligations will be paid, not impaired *(Faitoute Co. v Asbury Park,* 316 US 502, 509).

The intervention of the State via the passage of section 153-c is not only clothed with a strong presumption of constitutionality *(People v Pagnotta,* 25 NY2d 333, 337; *I.L.F.Y. Co. v Temporary State Housing Rent Comm.,* 10 NY2d 263, 269, app dsmd 369 US 795), it is also accompanied by a further presumption that the Legislature has investigated and found facts necessary to support the legislation *(Lincoln Bldg. Assoc. v Barr,* 1 NY2d 413, 415; *East N. Y. Sav. Bank v Hahn,* 293 NY 622, 628, affd 326 US 230). The Court of Appeals has recently held that "as a matter of substantive law every legislative enactment is deemed to be constitutional until its challengers have satisfied the court to the contrary" *(Montgomery v Daniels,* 38 NY2d 41, 54). In this context, it is our view that the subject legislation did not impair the contract between the Authority and the bondholders. Rather, it is a

proper exercise of the reserved powers of the State on behalf of the people.

The order and judgment should be reversed, insofar as it declared subdivision 1 of section 153-c of the Public Authorities Law unconstitutional and affirmed in all other respects.

SWEENEY and KANE, JJ., concur with KOREMAN, P. J.; MAHONEY and LARKIN, JJ., concur in part and dissent in part in an opinion by MAHONEY, J.

Order and judgment affirmed, without costs.