Jackson v Citywide Mobile Response Corp. (2023 NY Slip Op 23283)

[*1]

Jackson v Citywide Mobile Response Corp.

2023 NY Slip Op 23283

Decided on September 15, 2023

Supreme Court, Bronx County

Gomez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on September 15, 2023
Supreme Court, Bronx County

Tray Jackson, INDIVIDUALLY AND TRAY JACKSON ON BEHALF OF THE PROPOSED CLASS, Plaintiff(s),

against
Citywide Mobile Response Corp., Defendant(s).

Index No. 811859/22E

Counsel for plaintiff: Law Office of Mohammed Gangat
Counsel for defendant: Peckar & Abramson, PC 

Fidel E. Gomez, J.

In this action for violations of the New York State Labor Law (Labor Law) and the New York Code of Rules and Regulations (NYCRR), plaintiff moves for an order pursuant to CPLR §§ 901 and 902, for class certification. Plaintiff avers that class certification is warranted because his claims that defendant violated the Labor Law and the NYCRR by failing to pay all wages due thereunder and by failing to, inter alia, provide reimbursement for the cost of uniforms and supplies are, inter alia, typical of the members of the putative class, whose membership is numerous, totaling approximately 200 people. Defendant opposes the instant motion asserting that denial is warranted because plaintiff fails to submit evidence sufficient to establish all of the factors required for class certification.
For the reasons that follow hereinafter, the instant motion is granted.
The instant action is for violations of Articles 6 and 19 of the Labor Law and 12 NYCRR 142. The amended complaint[FN1]
 alleges that between October 2018 and December 2019 and August 17, 2021 and April 2022, defendant, an ambulance service company, which provides ambulances services in New York City, employed plaintiff as an Emergency Medical Technician (EMT). During his employment, plaintiff regularly worked over 10 hours per day. Plaintiff's shifts required him to report to defendant's office and lot, located at 1624 Stillwell Avenue, Bronx, NY (1624), where he would "clock in", pick up his equipment, get into an ambulance along with a driver, and then wait for a dispatcher to assign patients to him. In order to ensure that the ambulance was prepared to respond to calls at the start of each shift, the ambulance was required to be fully stocked with supplies. The EMT driver or paramedic had to ensure that he/she had all necessary equipment and that it was operable. The foregoing required that plaintiff report to work prior to the start of his shift. As a result plaintiff would "clock in" before the start of his shift and would often "clock out" after the scheduled end of his shift. Despite the [*2]foregoing, defendant routinely did not memorialize plaintiff's actual start and end times, rounding the former up and the latter down. As a result, plaintiff never received full credit for the time he actually worked - usually several extra hours per week - and never got paid for that time. Because plaintiff's rate of pay was at or near the minimum wage - $13.50 per hour in 2018 and $18 per hour in 2021 and 2022 - the foregoing practice resulted in pay to plaintiff that was below the prevailing minimum wage. Additionally, when plaintiff worked over 40 hours per week, he never received any overtime pay.
In addition to the foregoing, plaintiff was also required to wear a uniform while employed by defendant, consisting of navy blue cargo pants, a summer shirt with defendant's logo inscribed thereon, a winter shirt with patches also bearing defendant's logo, a fleece in the fall with reflective lettering and a patch bearing defendant's logo, a down jacket with a patch also bearing defendant's logo, and hats/beanies bearing defendant's logo. Plaintiff was also required to carry a tech bag with supplies. The foregoing uniform and bag were mandatory and were conditions of plaintiff's employment. The cost of the foregoing uniform, tech bag, and supplies was deducted from plaintiff's pay in amounts totaling $275-$400. Defendant never provided any uniform maintenance pay to plaintiff nor did it launder the uniforms for him.
Based on the foregoing, plaintiff interposes five causes of action. The first cause of action is for a violation of the Labor Law, premised on unpaid wages for failure to provide uniform maintenance pay. It is alleged that the sums paid to plaintiff were either at the minimum wage, or due to deductions for uniforms, the tech bag, and supplies, at a rate below the minimum wage in violation of Article 9 of the Labor Law and 12 NYCRR 142-2.5(c). The second cause of action is for a violation of the Labor Law, premised on the failure to pay a spread of hours premium. It is alleged that plaintiff regularly worked more than 10 hours and that defendant failed to pay him an additional hour's pay in violation of Labor Law § 65, et seq. and 12 NYCRR 142, et seq. Specifically, it is alleged that on a typical day in 2018, when plaintiff worked 10.5 hours at a rate of $13.50 per hour, he was paid $141.75, but should have been paid $149.50. The third cause of action is for a violation of the Labor Law, premised on unpaid wages caused by rounding errors. It is alleged that defendant's practice and policy of shaving the time worked by plaintiff resulted in unpaid wages in violation of Labor Law §§ 2 and 651. The fourth cause of action is for a violation of the Labor Law for failure to provide wage notices and statements. It is alleged that defendant has never provided plaintiff with the notices required by Labor Law § 195(1), apprising him, inter alia, of his rate of pay and the basis for the same. The last cause of action is for violation of the Labor Law premised on illegal wage deductions. It is alleged that defendant deducted the cost of a tech bag and tools from plaintiff's pay, in violation of Labor Law § 193. It is alleged that the foregoing facts and claims apply equally to all members of the putative class.
Plaintiff's application for an order granting class certification is granted. Significantly, the record establishes that all of the requirements promulgated by CPLR § 901, as interpreted by prevailing case law, have been met and that all the factors promulgated by CPLR § 902 militate in favor of class certification, thereby warranting the relief requested.
Standard of Review
CPLR § 902 states that an action "may be maintained as a class action only if the court finds that the prerequisites under section 901 [of the CPLR] have been satisfied." CPLR § 901(a) states that one may sue as a representative of a class if
the class is so numerous that joinder of all members, whether otherwise required or [*3]permitted, is impracticable . . . there are questions of law or fact common to the class which predominate over any questions affecting only individual members . . . the claims or defenses of the representative parties are typical of the claims or defenses of the class . . . the representative parties will fairly and adequately protect the interests of the class; and . . . a class action is superior to other available methods for the fair and efficient adjudication of the controversy.
Accordingly, a class action can only be maintained if the prerequisites promulgated by CPLR § 901(a) are met (Pludeman v N. Leasing Sys., Inc., 74 AD3d 420, 421 [1st Dept 2010]; Ackerman v Price Waterhouse, 252 AD2d 179, 191 [1st Dept 1998]; Weinberg v Hertz Corp., 116 AD2d 1, 4 [1986], affd 69 NY2d 979 [1987]). If the foregoing prerequisites: (1) that the class is so numerous that joinder of all members is impracticable (numerosity); (2) questions of law or fact common to the class predominate over questions of law or fact affecting individual class members (commonality); (3) the claims or defenses of the class representatives are typical of those in the class (typicality); (4) the class representatives will fairly and adequately protect the interests of the class (adequacy); and (5) a class action represents the superior method of adjudicating the controversy (superiority) are met, the court, in deciding whether to grant class action certification should then consider the additional factors promulgated by CPLR § 902, namely, the interest of individual class members in maintaining separate actions and the feasability thereof; the existence of pending litigation regarding the same controversy; the desirability of the proposed class forum; and the difficulties likely to be encountered in managing the class action (CPLR § 902; Pludeman at 421-422 Ackerman at 191; see also Cooper v Sleepy's, LLC, 120 AD3d 742, 743 [2d Dept 2014]; Globe Surgical Supply v GEICO Ins. Co., 59 AD3d 129, 136 [2d Dept 2008]).
The proponent of an application for class certification bears the burden of establishing that the factors promulgated by CPLR §§ 901 and 902 are met (Pludeman at 422; CLC/CFI Liquidating Trust v Bloomingdale's, Inc., 50 AD3d 446, 447 [1st Dept 2008]; Globe Surgical Supply at 137; Kings Choice Neckwear, Inc. v DHL Airways, Inc., 41 AD3d 117 [1st Dept 2007]; Ackerman at 191), and such burden must be met with the tender of admissible evidence (Weinstein v Jenny Craig Operations, Inc., 138 AD3d 546, 547 [1st Dept 2016]; Pludeman at 422; Kudinov v Kel-Tech Const. Inc., 65 AD3d 481, 481 [1st Dept 2009]; Feder v Staten Is. Hosp., 304 AD2d 470, 471 [1st Dept 2003]). Significantly, conclusory assertions are insufficient to satisfy the statutory criteria (Pludeman at 422; Felder at 471; Chimenti v American Express Co., 97 AD2d 351, 352 [1983]), and an application for class certification premised solely on the pleadings and affirmations by counsel will be denied (Chimenti at 352 ["It was an abuse of discretion to certify the class solely on the basis of the pleadings and the affidavit by plaintiff's counsel which contain conclusory allegations that the requirements are met."]). Conversely, the tender of affidavits and other documents does provide a sufficient evidentiary basis upon which to grant an application for class certification (Dabrowski v Abax Inc., 84 AD3d 633, 634 [1st Dept 2011]["Plaintiffs' evidence in support of class certification, including both the affidavits and paycheck stubs, demonstrated merit to plaintiffs' claims that they, and other similarly-situated laborers employed by the corporate defendant (Abax), may have been subject to a practice by Abax to underpay on wages, overtime and benefits during employment on public works contracts" [internal citations omitted; Kudinov at 481 ["Here, the evidence is sufficient to establish numerosity, without determining the precise number, given the number of projects, the certified payroll records and the testimony and affidavits regarding the number of workers [*4]potentially affected by the allegations."]).
CPLR §§ 901 and 902 "should be liberally construed" (Kudinov at 481; Englade v Harpercollins Publishers, Inc., 289 AD2d 159 [1st Dept 2001]; Pruitt v Rockefeller Ctr. Properties, Inc., 167 AD2d 14, 21 [1st Dept 1991]; Brandon v Chefetz, 106 AD2d 162, 169 [1st Dept 1985]), and any error militates in favor of class certification (Pruitt at 21; Brandon at 168; Friar v Vanguard Holding Corp., 78 AD2d 83, 100 [2d Dept 1980]). The foregoing is particularly true where each member of the putative class has sustained damages insufficient to justify individual and separate actions (Pruitt at 21), and even if some of the criteria prescribed by the statute is unmet (Friar at 90 ["We disagree, however, with the view expressed by our dissenting colleague that class action status was erroneously granted because some of the criteria of CPLR 901 (subd a) for such status went unmet."]).
In determining whether an action should proceed as a class action, it is appropriate to consider whether the claims have merit (Pludeman at 422; Bloom v Cunard Line, 76 AD2d 237, 240 [1980] ). However this "inquiry is limited," (Pludeman at 422; Bloom at 240), meaning that such threshold determination is not intended to be a substitute for summary judgment or trial (Pludeman at 422; Kudinov at 482). Thus, class action certification is appropriate if on the surface there appears to be a cause of action which is not a sham (Pludeman at 422; Brandon at 168). Accordingly, and logically, questions of fact with respect to allegations made on an application seeking class certification will not preclude certification (Kudinov at 482 ["While Kudinov's testimony and his affidavit as to his record keeping and the number of employees at the projects where he worked contained inconsistencies, his claim has sufficient merit for the limited purposes of determining whether to certify this class. Those inconsistencies present, as the court correctly determined, issues for resolution by the trier of fact."]). 
With respect to the numerosity requirement promulgated by CPLR § 903(a)(1) - that the class of plaintiffs is so numerous that joinder of all members in a separate actions is impracticable - there exists no mechanical test which can be employed to determine whether the standard has been met (Globe Surgical Supply at 137; Friar at 96). Instead, whether the requirement has been met is particular to each case and the "circumstances surrounding the proposed class" (Frair at 96). Generally, as a matter of law, numerosity does not exist where the class does not exceed 45 people (Bloom at 240 ["It is conceded that 45 members of the potential class have brought a nonclass action for the same relief, which hardly supports the contention that a class action is warranted because of numerosity."]; Klakis v Nationwide Leisure Corp., 73 AD2d 521, 521 [1st Dept 1979] ["We note, however, that class-action status was properly denied by Special Term. There appear to be but twenty-one tourists who have not yet settled their claims."]). By contrast, where the proposed class includes at least 80 people, as a matter of law, the numerosity requirement has been met (Pesantez v Boyle Envtl. Services, Inc., 251 AD2d 11, 11-12 [1st Dept 1998] ["Boyle's certified payroll records list over a hundred employees who worked on the project in question, and the named plaintiffs identify about 80 workers; whatever the exact number, we are satisfied that joinder of all of Boyle's employees is impracticable within the meaning of CPLR 901(a)(1)."]). Significantly, when the evidence presented fails to establish the exact number of members in the putative class, the numerosity requirement has not been met (Kudinov at 484 ["Furthermore, there is no evidence that numerosity has been established. As the majority acknowledges, the exact number of members of the putative class has not been established. Moreover, at least 12 members of the putative class, whatever its number may be, have sworn that they do not have grievances. It is just as likely, on the record before us, that the [*5]purported class consists of nothing more than the named plaintiffs, as it is that there are many workers who were underpaid. Plaintiffs have not come close to meeting their burden of establishing numerosity."]). 
CPLR § 901(a)(2), the commonality requirement, requires that questions of law or fact common to the class outnumber any questions affecting individual class members (Pludeman at 422). However, the rule requires predominance not complete identity or unanimity among class members (id. at 423; Friar at 98). Moreover,
commonality is not merely an inquiry into whether common issues outnumber individual issues but rather whether the use of a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated
(Pludeman at 423; Friar at 97). Indeed, class certification is appropriate even when there are questions of law or fact not common to all class members (Pludeman at 423; Kudinov at 482 ["The fact that different trades are paid on a different wage scale and thus have different levels of damages does not defeat certification."]; Freeman v Great Lakes Energy Partners, L.L.C., 12 AD3d 1170, 1171 [2004]; Weinberg at 6). However, when individualized proof is required for the claims alleged or individual factual questions with respect to individual class members preponderate, as a matter of law, commonality is lacking (Pludeman at 42-423; CLC/CFI Liquidating Trust at 447; DeFilippo v Mutual Life Ins. Co. of NY, 13 AD3d 178, 180-181 [2004], lv dismissed 5 NY3d 746 [2005]; Banks v Carroll & Graf Publis., 267 AD2d 68, 69 [1999]). 
CPLR § 901(a)(3) requires that the claims asserted by the plaintiff seeking to represent the class and any defenses to those claims be typical of the claims made by the members of the class and any defenses asserted against them (Pludeman at 423). When it is demonstrated that a plaintiff's claims derive from "the same practice or course of conduct that gave rise to the remaining claims of other class members and is based upon the same legal theory the typicality requirement is satisfied" (id. at 423 {internal quotation marks omitted].]; Friar at 99; see also Freeman at 1171; Ackerman at 201; Pruitt at 22). Notably, typicality does not require complete identity of issues and the requirement is met even if the claims asserted by class members differ from those asserted by other class members (Pludeman at 423; Pruitt at 22; Super Glue Corp. v Avis Rent A Car Sys., Inc., 132 AD2d 604, 607 [1987]). Indeed, the typicality requirement is met "even if the class representative cannot personally assert all the claims made on behalf of the class" (Pruitt at 22; see Weinberg at 7 ["Defendant's assertion that plaintiff Weinberg's course of conduct is not typical of the class that he purports to represent because (1) he does not have an individual contract claim, (2) he cannot show on an individual basis reliance as to General Business Law § 349 claims and resulting injury, and (3) as a sophisticated attorney he could not show a lack of meaningful choice, is no basis for denying class action status, even if true" [internal quotation marks omitted].). Nor is typicality defeated merely because the damages asserted by the class members are incongruous (Godwin Realty Assoc. v CATV Enterprises, Inc., 275 AD2d 269, 270 [1st Dept 2000 ["To the extent that there may be differences among the class members as to the degree in which they were damaged, the court may try the class aspects first and have the individual damage claims heard by a special master or create subclasses."]; Weinberg at 6 ["That individuals who are members of the class might have been subjected to less than all of the conduct complained of is not a ground for denying class action. Whatever differences there are do not override the common questions of law and fact. As noted, subclasses may be created to deal with the differences, if needed."]). 
To determine whether the adequacy requirement promulgated by CPLR § 901(a)(4) is met - meaning whether the named plaintiff will adequately represent the class' interest - the court must review both the lead plaintiff and his/her counsel's fitness. Significantly, the court must examine whether the plaintiff has a conflict of interest with other members of the class, plaintiff's background and character, and whether plaintiff is sufficiently familiar with the lawsuit, such that he/she has the ability to aid counsel in the prosecution of the action (Pruitt at 24; Super Glue Corp. at 607). Additionally, the court must also examine the experience and competence of plaintiff's counsel and whether counsel has the requisite financial resources to prosecute the action (Pruitt at 24; Super Glue Corp. at 607). In Pruitt, the court held that the adequacy standard had been met when it determined that plaintiff possessed no conflict of interest with any other class member and that he "met the statutory adequacy and fairness of representation standard" (id. at 24). With respect to the plaintiff's counsel, the court noted that
[h]is counsel is experienced in class action litigation, particularly in the securities law area. Plaintiff is well educated and has pursued a career in business, with an emphasis on securities and investments. As is clear from the transcript of his deposition, he is familiar with the substantive allegations of the complaint. He has also been involved in charitable and community affairs, further evidencing his fitness to discharge his fiduciary obligations and act zealously and faithfully in the interest of the other class members
(id. at 24).
Lastly, the superiority requirement promulgated by CPLR § 901(a)(1) - meaning that a class action is superior to other methods available to prosecute the claims asserted - is satisfied when the damages sustained by each member of the putative class are so modest that it is unlikely that the members would institute separate actions (Nawrocki v Proto Const. & Dev. Corp., 82 AD3d 534, 536 [1st Dept 2011] ["Rather, since the damages allegedly suffered by an individual class member are likely to be insignificant, and the costs of prosecuting individual actions would result in the class members having no realistic day in court, we find that a class action is the superior vehicle for resolving this wage dispute."]; Dabrowski at 635 ["Finally, the proposed class action is superior to the prosecution of individualized claims in an administrative proceeding in view of the difference in litigation costs, the laborers' likely insubstantial means, and the modest damages to be recovered by each individual laborer, if anything"]; Englade at 160 ["Class certification, under the circumstances presented here, is also appropriate since the damages suffered by many individual authors would likely be insufficient to warrant their institution of separate suits."]; Pesantez at 12; Weinberg at 7 ["Finally, it is notable that in determining whether a class action is superior to other viable methods, it is clear that most of the individuals having claims averaging less than $31 would have no realistic day in court if a class action were not available."]).
CPLR § 902, states that class certification can only be ordered if the requirements of CPLR § 901 have been met and upon consideration of five additional factors, namely,
[t]he interest of members of the class in individually controlling the prosecution or defense of separate actions . . . The impracticability or inefficiency of prosecuting or defending separate actions . . . The extent and nature of any litigation concerning the controversy already commenced by or against members of the class . . . The desirability or undesirability of concentrating the litigation of the claim in the particular forum . . . [and] The difficulties likely to be encountered in the management of a class action
Despite the foregoing language, there are very few appellate decisions, which actually apply, let alone discuss the factors within CPLR § 902, making the application of the factors therein wholly within the trial court's discretion (Vincent C. Alexander, Prac Commentaries, McKinney's Cons Laws of NY, CPLR C902:2 ["Despite the mandatory language, the role played by these factors in class action practice in New York has been somewhat murky."]). Indeed, despite the compulsory language within CPLR § 902, requiring that the court consider the factors therein, most cases simply do not discuss them (see generally Pludeman, 74 AD3d 420; Ackerman, 52 AD2d 179; Friar, 78 AD2d 83), some only discuss a few of those factors (Tanzer v Turbodyne Corp., 68 AD2d 614, 621 [1st Dept 1979] [Court held that because the action brought in New York involved Delware corporations governed by Delaware law, CPLR § 902(4) - "[t]he desirability or undesirability of concentrating the litigation of the claim in the particular forum" - militated against class certification.]), and others merely state that the determination of the factors therein is fact specific (Chimenti at 358 ["Special Term should have held the mini-hearing referred to in the Practice Commentary, preceded by limited discovery, to determine whether the prerequisites to class certification listed in CPLR 901 are present, and to assess the feasibility considerations listed in CPLR 902 in relation to the particular facts. It was an abuse of discretion to certify the class solely on the basis of the pleadings and the affidavit by plaintiff's counsel which contains conclusory allegations that the requirements are met" (internal citations and quotation marks omitted).]). In Fleming v Barnwell Nursing Home and Health Facilities, Inc. (309 AD2d 1132 [3d Dept 2003]), one of the few cases to apply and briefly discuss all the factors within CPLR § 902, the court, after determining that all of the requirements promulgated by CPLR § 901 had been met, held that each requirement under CPR § 902, had also been met and listed each one (id. at 1134 ["Presumably, aged and infirm nursing home residents are not interested in individually controlling the prosecution of the action (see CPLR 902[1] ), prosecuting separate actions would be inefficient and impractical (see CPLR 902[2]; Public Health Law § 2801—d [2] [providing a common formula to ascertain damages to individual class members]), no other litigation concerning this controversy is currently in progress (see CPLR 902[3]), it is desirable to concentrate the litigation in the county where the facility is located (see CPLR 902[4] ), and there are no apparent difficulties in managing this class (see CPLR 902[5])." The foregoing dearth of cases discussing CPLR § 902 is likely attributable, as noted by the trial court in Gilman v Merrill Lynch, Pierce, Fenner & Smith, Inc. (93 Misc 2d 941 [Sup Ct 1978]), to the fact that "most of these considerations [namely those discussed by CPLR § 902] are implicit in 901."]). Indeed, CPLR § 902(2) - "[t]he impracticability or inefficiency of prosecuting or defending separate actions - is inherent in determining whether the superiority requirement under CPLR § 901(a)(5) has been met. Similarly, whether "[t]he difficulties likely to be encountered in the management of a class action" (CPLR § 902[5])," is part and parcel of the analysis to determine whether the adequacy requirement under CPLR § 901(4) - that "the representative parties will fairly and adequately protect the interests of the class" - has been met.
When the court grants class certification its order must (1) describe the class (CPLR § 903), provide notice to all class members (CPLR § 904[b]), and in determining how notice is to be provided, must consider
the cost of giving notice . . . the resources of the parties and . . . the stake of each represented member of the class, and the likelihood that significant numbers of represented members would desire to exclude themselves from the class or to appear individually, which may be determined, in the court's discretion, by sending notice to a [*6]random sample of the class.
Discussion
In support of his motion, plaintiff submits an affidavit, wherein he states that he worked for defendant as an EMT between October 18, 2018 and December 28, 2018 and then again between August 17, 2021 and March 18,2022. When he started his employment, plaintiff and approximately 10-15 other drivers and EMTs attended an orientation led by defendant's head of training. While at the orientation he and the others were informed that they would be required to wear uniforms provided by defendant, and that they were required to own tech bags containing certain equipment and supplies. Because payment for the foregoing items would be deducted from his paychecks, plaintiff signed a form authorizing the same. Plaintiff states that he also reviewed defendant's employment handbook, which stated that "only those uniforms pieces issued by the company, are acceptable," and that any reference to uniform shirt therein meant the shirts provided by defendant. The employee handbook further stated that all employees were required to own personal equipment, which could be purchased by them or supplied by defendant. The latter option would result in the cost of the equipment being deducted from an employee's paycheck. Defendant neither laundered the uniforms nor provided any pay to maintain the same and the employees were solely responsible for uniform maintenance. Like all drivers and paramedics, plaintiff was required to, and did wear a uniform top with logos and an insignia. In the summer, plaintiff wore a shirt with defendant's logo and the words "Mobile Response" across his chest. In colder weather, plaintiff wore a warm top with patches bearing defendant's logo and the words "NYS EMT." In the winter, plaintiff also wore a fleece with reflective lettering on the back and patch bearing defendant's logo. Lastly, plaintiff had a down jacket with reflective lettering and a patch bearing defendant's logo. Plaintiff did not consider the foregoing items of clothing part of his ordinary wardrobe. When plaintiff began working for defendant in 2018, his rate of pay was $13.50 per hour. As an EMT, plaintiff reported to 1624 for work, where he would prepare his ambulance to begin his shift. Plaintiff then waited for defendant's dispatchers to assign patients to him in order to provide them with medical assistance and/or transportation to a hospital. Plaintiff would routinely work shifts exceeding 10 hours. Between October 16, 2018 and October 23, 2018, for example, plaintiff's shifts exceeded 10 hours and ranged between 11.75 hours and 13.75 hours. Despite the foregoing, defendant never provided plaintiff spread of hours pay, which required an extra hour's pay. Plaintiff's pay stub, dated November 9, 2018, evinces that plaintiff worked 39.50 hours at $13.50 per hour and was paid a total of $533.25. However, pursuant to law, he should have been provided spread pay totaling $45 plus uniform pay totaling $16.20. This meant that instead of $533.25, plaintiff should have been paid $574.70 and for that week alone, there is a deficiency in the sum of $41.45. The same pay stub also reflects that plaintiff was deducted $62.50 for his uniform and tech bag. The $52.50 deduction for his tech bag was labeled as "CMR Outlay Reimb," and the $10 deduction for his uniform was labeled "Uniform No.2." Subsequent pay stubs also evince deductions for plaintiff's uniform and equipment ranging between $10 and $23.80. Plaintiff alleges that at the time he worked for defendant, there were at least 200 other people employed by defendant, who were either drivers, EMTs, or paramedics. 
Plaintiff submits an affidavit by Shanice Alston (Alston), who states that she worked for defendant as a paramedic from July 15, 2019 to October 25, 2020. When she started her employment, Alston attended an orientation led by defendant's head of training. 10-15 other drivers, EMTs, and paramedics attended the orientation. Per defendant's employee handbook, [*7]"only those uniforms pieces issued by the company, are acceptable." Moreover, the uniform shirt referenced by the handbook refers to the shirts provided by defendant. With respect to the foregoing uniform, Alston would either have to pay defendant for the same or could have the cost associated therewith deducted from her paycheck. Pursuant to the handbook, employees were also required to pay for personal equipment either by purchasing it on their own, or having it supplied by defendant. If an employee chose the latter, defendant would deduct the cost of the equipment from the employee's pay. Alston's uniform varied with the seasons and based on the availability of the uniform. Initially, defendant provided Alston with a shirt bearing logos and an insignia. The logos identified for whom Alston worked and her certification level. To that end, her logos bore defendant's name and the words "Mobile Response" and "NYC Paramedic." An EMT's logo bore defendant's name and read "Mobile Response" and "NYC EMT." A driver's logo bore defendant's name and the driver's assignment. Defendant never offered to launder the uniforms and employees were responsible for the uniform's maintenance. During the period that Alston worked for defendant, there were approximately 200 employees employed thereat, said employees comprised of drivers, paramedics, or EMTs, and all who wore the uniform provided by defendant. Alston did not consider her uniform part of her wardrobe. 
Defendant submits an affidavit by Marilyn Lopez (Lopez), who states that she worked for defendant as an EMT between March 2021 and October 2022. Lopez' statements regarding the uniforms required by defendant are identical to those made by Alston. 
Plaintiff submits portions of defendants employee handbook. With respect to uniforms, insofar as relevant, the handbook states that
[a]ll employees must be in full, proper uniform while on the premises during their normal working hours. Only those uniforms issued by the company , are acceptable. These include pants, shirts, winter jackets, ties, and hats. No other items, unless specified below can be worn on duty. All items are to be in clean and pressed condition . . .
Summer uniforms will be worn from April 15 to October 14 and Winter uniforms from October 15 to April 14. Every employee must, as a condition of employment, provide certain pieces of clothing which complete the primary uniform. The pieces of clothing which must be provided by the employee are ; . . . a. Plain shoes or boots of the lace-up type. Sneakers and other types of footwear are not permitted. Shoes are to be shined and maintained in that condition b. Plain black or navy blue socks. c. Black leather belt - plain. . . . With regard to equipment, the handbook states
[t]he EMT or Paramedic is responsible for providing the Personal Equipment where applicable . . . The EMT or paramedic is responsible for providing the following personal equipment: Adult BP cuff, Stethoscope, and Pen light, Cutting shears, O2 Wrench watch with a second hand, and a black or blue pen . . . The (drivers) EMT, Paramedic, Ambulance and Ambulette Drivers are responsible for providing a large Hagstrom Five Borough and Westchester map. Plaintiff submits his payroll records, which he referenced in his affidavit. Insofar as relevant, there are several pay stubs for year 2018 which evince that plaintiff was paid at a rate of $13.50 per hour and that when he worked 39.50 hours, he was paid $533.25, that he was deducted $10 dollars for a category labeled "Uniform" and $52.50 for a category labeled "CMR Outlay Reimbursement." The foregoing deductions are reflected in virtually every pay stub and in 2021, the pay stubs reflect deductions under a category labeled "equipment deduction."
Based on the foregoing, the instant application is granted. 
As noted above, a class action can only be maintained if the prerequisites promulgated by CPLR § 901(a) are met (Pludeman at 421; Ackerman at 191; Weinberg at 4). If the factors in CPLR § 901 are met, namely, numerosity, commonality, typicality, adequacy, and superiority, the court, must then consider the additional factors promulgated by CPLR § 902 (Pludeman at 421-422 Ackerman at 191; see also Cooper at 743; Globe Surgical Supply at 136).
The proponent of an application for class certification bears the burden of establishing that factors promulgated by CPLR §§ 901 and 902 are met (Pludeman at 422; CLC/CFI Liquidating Trust at 447; Globe Surgical Supply at 137; Ackerman at 191; Kings Choice Neckwear, Inc. at 117), and such burden must be met with the tender of admissible evidence (Weinstein at 547; Pludeman at 422; Kudinov at 481; Feder at 471). The tender of affidavits and other documents provides a sufficient evidentiary basis upon which to grant an application for class certification (Dabrowski at 634; Kudinov at 481).
CPLR §§ 901 and 902 "should be liberally construed" (Kudinov at 481; Englade at 159-160; Pruitt at 21; Brandon at 169, and any error militates in favor of class certification (Pruitt at 21; Brandon at 168; Friar at 100). In determining whether an action should proceed as a class action, it is appropriate to consider whether the claims have merit (Pludeman at 422; Bloom at 240). However this "inquiry is limited," (Pludeman at 422; Bloom at 240), meaning that such threshold determination is not intended to be a substitute for summary judgment or trial (Pludeman at 422; Kudinov at 482). Thus, class action certification is appropriate if on the surface there appears to be a cause of action which is not a sham (Pludeman at 422; Brandon at 168). Moreover, questions of fact with respect to allegations made on an application seeking class certification will not preclude certification (Kudinov at 482).
Here, the admissible evidence tendered by plaintiff, most notably the affidavits and portions of defendant's handbook, if true, establish potential violations of sections of the Labor Law and the New York Code of Rules and Regulations governing spread pay and uniform allowances. Thus, the instant action is not a sham[FN2]
. Moreover, as relevant here, the evidence establishes all of the requirements for class certification promulgated by CPLR § 901 and when applying CPLR § 902, all the factors listed therein militate in favor of class certification.
First, with respect to numerosity, there exists no mechanical test to determine whether the standard has been met (Globe Surgical Supply at 137; Friar at 96) and whether the requirement has been met is particular to each case and the "circumstances surrounding the proposed class" (Frair at 96). That said, generally, numerosity does not exist as a matter of law where the class does not exceed 45 people (Bloom at 240; Klakis at 521) and where the proposed class includes at least 80 people, as a matter of law, the numerosity requirement has been met (Pesantez at 11-12; Kudinov at 484). Here, with the affidavits by plaintiff, Alston and Lopez, which state that at the time of the alleged tortious practices on which the complaint is premised there were approximately 200 people employed by defendant, the record demonstrates that the size of the putative class is sufficient as a matter of law. 
Second, with respect to commonality, the inquiry is whether there are questions of law or [*8]fact common to the class that outnumber any questions affecting individual class members (Pludeman at 422). The rule requires predominance not complete identity or unanimity among class members (id. at 423; Friar at 98). Significantly, commonality is not just an inquiry into whether common issues outnumber individual issues, but instead whether a class action would achieve economies of time, effort, and expense, so as to promote uniformity of decision as to persons similarly situated (Pludeman at 423; Frair at 97). Thus, class certification is appropriate even when there are questions of law or fact not common to the class (Pludeman at 423; Kudinov at 482; Freeman at 1171; Weinberg at 6). When individualized proof is required for the claims alleged or individual factual questions with respect to individual class members preponderate, commonality is lacking (Pludeman at 42-423; CLC/CFI Liquidating Trust at 447; DeFilippo at 180-181 [2004]). Here, the evidence demonstrates that there are three categories into which plaintiff's claims fit: whether defendant violated the law by failing to pay him appropriate wages; whether defendant violated the NYCRR by failing to reimburse plaintiff for uniform and equipment expenditures; and whether defendant violated the Labor Law by failing to provide him wage notices. Although plaintiff alleges that all claims were not unique to him, neither Alston nor Lopez assert any claims related to wages and wage notices. Indeed, their claims are solely related to causes action one and five; the equipment and uniform claims. Nevertheless, within his affidavit, plaintiff asserts that the claims alleged are widespread and coupled with the documentary evidence - pay stubs and the employee handbook, plaintiff sufficiently demonstrates that he and the members of the putative class have identical claims. At the very least, given Alston and Lopez' affidavits, it appears that but for the amount of damages, all class members have claims arising out of defendant's uniform and equipment practices. Thus, congruity of questions of law and fact predominate over any individual claims, such that plaintiff establishes the existence of commonality. 
Third, with regard to typicality, the law requires that the claims asserted by the plaintiff seeking to represent the class and any defenses to those claims be typical of the claims made by the members of the class and any defenses asserted against them (Pludeman at 423). When it is demonstrated that a plaintiff's claims derive from "the same practice or course of conduct that gave rise to the remaining claims of other class members and is based upon the same legal theory the typicality requirement is satisfied" (id. at 423 [internal quotation marks omitted].]; Friar at 99; see also Freeman at 1171; Ackerman at 201; Pruitt at 22). Notably, typicality does not require complete identity of issues and the requirement is met even if the claims asserted by class members differ from those asserted by other class members (Pludeman at 423; Pruitt at 22; Super Glue Corp. at 607). Indeed, the typicality requirement is met "even if the class representative cannot personally assert all the claims made on behalf of the class" (Pruitt at 22; see Weinberg at 7) and typicality is not defeated merely because the damages asserted by the class members are incongruous (Godwin Realty Assoc. at 270; Weinberg at 6 ["That individuals who are members of the class might have been subjected to less than all of the conduct complained of is not a ground for denying class action. Whatever differences there are do not override the common questions of law and fact. As noted, subclasses may be created to deal with the differences, if needed."]). Here, as discussed above, the record establishes that the claims made by plaintiff are typical of the claims made by members of the putative class. This is certainly true for the uniform and equipment claims, since per their affidavits, Alston and Lopez assert identical claims. It stands to reason that defendant's defenses for all of the foregoing claims, no matter who in the class makes them, will likely be the same. Accordingly, plaintiff [*9]establishes the typicality requirement.
Fourth, to determine whether the adequacy requirement is met, the court must review both the plaintiff and his counsel's fitness. Significantly, the court must examine whether the plaintiff has a conflict of interest with other members of the class, plaintiff's background and character, and whether plaintiff is sufficiently familiar with the lawsuit, such that he/she has the ability to aid counsel in the prosecution of the action (Pruitt at 24; Super Glue Corp. at 607). Additionally, the court must also examine the experience and competence of plaintiff's counsel and whether counsel has the requisite financial resources to prosecute action (Pruitt at 24; Super Glue Corp. at 607). Here, although the record is bereft of any evidence squarely establishing plaintiff's character, his affidavit describes his background, demonstrates that he was gainfully employed by defendant as an EMT, a position where he provided care to patients. For purposes of this motion, this is sufficient evidence that plaintiff possesses sufficient good character to represent the class. To the extent that it is clear that plaintiff has assisted counsel in the prosecution of this action, there is also sufficient evidence that plaintiff can effectively assist counsel in the prosecution of this case. Thus, te record sufficiently establishes that plaintiff is fit to serve as the lead plaintiff in this class action law suit. Moreover, as an EMT with no apparent supervisory authority, it does not appear that plaintiff would have any conflicts of interest with other members of the class, which would be limited to other EMTS, paramedics, and drivers. With respect to counsel's ability and experience, he states that he is a graduate of Georgetown Law School, with over a decade of litigation experience in state and federal courts. He also states that he is very experienced in the litigation of class action law suits and cases like this one, premised on labor and employment claims, and that he has previously been appointed as lead counsel in class action law suits. Thus, the Court is satisfied that counsel has the competence, experience and financial resources to prosecute this class action. Accordingly, plaintiff satisfies the adequacy requirement.
Lastly, the superiority requirement is satisfied when the damages sustained by each member of the putative class are so modest that it is unlikely that the members would institute separate actions (Nawrocki at 536; Dabrowski at 635; Englade at 160; Pesantez at 12; Weinberg at 7). Here, to the extent that the sums claimed are relatively modest - uniform deductions in the sum of $10, equipment and supply deduction each totaling approximately $52.50, and the failure to pay spread wages of only several hours, which some weeks only amounted to a deficit of $41.45 - it is clear that the damages sought, even cumulatively, would not warrant the expense of an action by each individual plaintiff. Thus, plaintiff establishes the superiority requirement.
As noted above, while the jurisprudence premises class certification on satisfaction of the factors in CPLR §§ 901 and 902, there are nevertheless very few appellate decisions, which apply, let alone discuss the factors listed within CPLR § 902 (see generally Pludeman at 425; Ackerman, 52 AD2d 179; Friar, 78 AD2d 83). This makes the application of the factors therein wholly within the trial court's discretion.
Here, for the reasons discussed above with respect to the factors listed in CPLR § 901, some of which, a noted by the court in Gilman "are implicit in [determining the factors within] 901" (id. at 948), resolution of the factors within CPLR § 902, militate in favor of class certification. To be sure, because the damages sought are modest, employing a cost benefit analysis makes bringing individual actions expensive, and thus, impractical. Accordingly, there can be no significant interest in bringing separate actions (CPLR § 902[1]) and indeed, it would be impractical to bring separate actions for the claims alleged (CPLR § 902[2]). Moreover, there [*10]is no indication that any other actions arising from the instant events have been brought which renders CPLR § 902(3), inapplicable. Because of the impracticability of bringing separate actions for these claims, it is therefore desirable that they be brought as a class action in this Court (CPLR § 902[4]). Lastly, given that the issues are few and relatively uncomplicated, it is hard to fathom what issues if any would arise, which would make it difficult to manage this action (CPLR § 902[5]). 
Nothing submitted by defendant or urged by it precludes class certification.
Defendant submits an affidavit by Warren Golden (Golden), defendant's Chief Operating Officer. Golden states that defendant is an ambulance service provider, who has provided non-emergency ambulance services in the New York City metropolitan area for 40 years. Defendant provides patient care and medical treatment through the EMTs, paramedics, and drivers that it employs. Defendant's employees are able to choose the length of their shifts and the number of days over which they work them. They can choose five eight-hour shifts, four 10-hour shifts, or three 12-hour shifts. Per defendant's Employee Rules, Regulations & Operating Procedures manual, which governs part of defendant's dress code
[a]ll EMTs, Paramedics, and Mechanics/Drivers, who are not supervisors, must wear a navy-blue shirt (or a white shirt for supervisors) and navy-blue pants. Employees are responsible for providing their shirts and pants and they are common stock. The navy-blue shirt may either be a common stock navy-blue winter shirt worn with a company-provided Velcro (i.e. removable) patch affixed sporting the Citywide logo, or a fully-optional summer polo. Employees must also wear dark boots or shoes, a dark belt and dark socks. If the employee wears an undershirt, it must be plain and white. There is no requirement that clothes be pressed, rather if an employee looks sloppy they will be counseled. Similarly, there is no strict enforcement of the dress code, if employees are generally wearing dark pants, shirts, shoes, a dark belt if any, and have affixed the Company logo to their clothing, they are deemed compliant.
As a result of the foregoing, other than the logo provided by defendant, the uniform is comprised of plain clothes, and as such, defendant does not provide uniform maintenance or maintenance pay. If an employee's clothing becomes contaminated during the discharge of an employee's duties, defendant replaces the clothing at defendant's expense. With respect to tools, EMTs and paramedics are required to own tools required in the their trade. These tools are carried in a tech bag. The tech bag includes a blood pressure cuff and a regulator for an oxygen tank. Since the vast majority of EMTs and paramedics receive the foregoing tools during their medical training, they already own them and need not purchase them from defendant. However, since they are required to work for defendant, defendant provides the tools and a tech bag for a fee. Employees can also purchase clothing from defendant's vendor. If they choose the foregoing, the costs can be deducted from an employee's paycheck. Golden states that plaintiff was hired by defendant as an EMT on October 8, 2018, was terminated on December 28, 2018, was rehired on August 16, 2021, and terminated on March 18, 2022. Plaintiff's pay and benefits were subject to the collective bargaining agreement between Local 741, National Association of Specialty Trades and defendant[FN3]
.
Defendant submits the same portion of the employee handbook regarding uniforms submitted by plaintiff.
Defendant submits a form titled Winter Uniform/Equipment Order Sheet, which lists the clothing and equipment that defendant's employees can purchase from defendant's vendor. The items include, shirts, jackets, beanies, and a tech bag.
Contrary to defendant's assertion, the foregoing evidence fails to preclude class certification because even if true, at best, it merely raises an issue of fact with regard to the claims asserted by plaintiff. Indeed, while not dispositive, it bears noting that the portion of defendant's manual, which Golden quotes, and which purportedly evinces that the uniform required is comprised of regular clothing, was not provided.
Nor does the Court find defendant's arguments regarding the sufficiency of plaintiff's proof availing. For example, with respect to numerosity, defendant assails the record, asserting that plaintiff, Alston, and Lopez' claims that defendant employed approximately 200 people is insufficient to meet the requisite burden. Relying on Katz v NVF Co. (100 AD2d 470 [1st Dept 1984]), defendant avers that the failure by plaintiff to ascertain the size of the class actually afflicted by the acts plaintiff asserts is fatal. Notwithstanding that what defendant urges - some kind of comprehensive poll of 200 people to ascertain if they were similarly afflicted - is not what the law requires, Katz is nonetheless inapposite. To be sure, in Katz, where the claims of fraud were premised on a failure to disclose facts which purportedly induced plaintiff and other class members to hold on to stock to their detriment, the Court noted as dispositive that "[n]o affidavit of the plaintiff was offered" in support of the motion (id. at 472) and that no "attempt ha[d] been made to ascertain how many persons comprise the class (id. at 473). Here unlike in Katz, plaintiff provided three affidavits describing the size of the class evincing that everyone similarly situated - approximately 200 people - were similarly injured. Moreover, unlike Katz where the size of the class was wholly dependent on the individual and varied reasons why individual stockholders held on to stock, only some of which were tortious (id. at 473 ["[p]laintiff improperly assumes that all of those who held their stock until the merger talks were discontinued did so in reliance upon the contemplated merger."]), here, the allegations are that everyone who worked for defendant was damaged by defendant's custom and practice - a portion of which was in writing - which is alleged to have violated the law in that all employees were required to purchase uniforms and equipment at their own expense and that all employees were systematically underpaid. It is also alleged that it was defendant's policy not to reimburse anyone for uniforms and equipment, a fact which Golden actually concedes. Stated differently, in Katz, the size of the class was dependent on the existence of facts that the plaintiffs therein failed to ascertain, whereas here, it is alleged that the size of the class is everyone who worked for defendant, since they were injured by a systemic course of conduct.
Inasmuch as the Court grants the instant motion, pursuant to the CPLR, it must also issue an order describing the class (CPLR § 903) and determine how notice is to be provided to the class members (CPLR § 904[b]).
Here, plaintiff's proposed order contains an adequate description, namely "[a]ll individuals working for Citywide Mobile Response Corp. as drivers, emergency medical technicians, or paramedics in New York between December 30, 2015 August 15, 2022." Thus, [*11]the universe of class members is limited to those whose claims, which accrued between the foregoing period of time, which as urged by plaintiff is six years prior to the commencement of this action plus an additional 228 days prior thereto. Indeed, the foregoing time period is appropriate. First, the statute of limitations for a wage and labor claim is six years (Labor Law § 198[3] ["Notwithstanding any other provision of law, an action to recover upon liability imposed by this article must be commenced within six years"]; Sedgwick v New York City Dept. of Educ., 215 AD3d 607, 608 [1st Dept 2023] ["Plaintiff styles his claim as a Labor Law § 198 claim concerning the underpayment of wages and seeking the primary relief of monetary damages, which would be subject to a six-year limitations period."]). Moreover, the additional 228 days accounts for a toll to all statute of limitations precipitated by the Covid-19 pandemic. To be sure, "[a] toll suspends the running of the applicable period of limitation for a finite time period, and the period of the toll is excluded from the calculation of the relevant time period" (Brash v Richards, 195 AD3d 582, 582 [2d Dept 2021] [internal quotation marks omitted]). Here, Governor Cuomo's pandemic era Executive Order # 202, issued in 2020, tolled all applicable statutes of limitations for a period of 228 days, which should thus be added to the instant six year statue of limitations (id. at 584 ["Governor Cuomo's March 20, 2020 executive order, Executive Order (A. Cuomo) No. 202.8 (9 NYCRR 8.202.8), expressly and plainly provided that the subject time limits were hereby tolled, and two of the subsequent executive orders referred to the temporary alternation of the subject time limits as a toll" (internal quotation marks omitted).]).
The Court also finds that plaintiff's publication order sufficiently notifies all potential class members in this action by mail at plaintiff's expense. It is hereby
ORDERED that the class in this action be certified and that this action proceed as a class action law suit with the following class of plaintiffs: All individuals working for Citywide Mobile Response Corp. as drivers, emergency medical technicians, or paramedics in New York between December 30, 2015 August 15, 2022. It is further
ORDERED that notice to all potential class members be provided pursuant to the Publication Order, dated September 15, 2023, and Notice of Class Action annexed hereto. It is further
ORDERED that plaintiff serve a copy of this Decision and Order with Notice of Entry upon defendant parties within thirty (30) days hereof.
This constitutes this Court's decision and Order.
Dated: September 15, 2023
Bronx, New York
_____________________________
FIDEL E. GOMEZ, JSC

Footnotes

Footnote 1: The complaint was initially filed on August 8, 2022. However, pursuant to the stipulation dated April 3, 2023, the parties stipulated to the amendment of the complaint, an amended copy of which was filed on that same date. 

Footnote 2: Plaintiff's causes of action are premised on a violation of Labor Law § 652, which prescribes a minimum hourly wage, 12 NYCRR 142-2.2.5(c), which requires that employers reimburse employees for the cost of required uniforms, and 12 NYCRR 142-2.4, which requires spread of hours pay. 

Footnote 3: While Golden states that what is appended to his affidavit as Exhibit B is defendant's Rules, Regulations & Operating Procedures manual, from which he quotes, that is not, in fact, what is appended to his affidavit. Instead, defendant resubmits the portion of the employee handbook submitted by plaintiff.